[942 NE2d 1026, 917 NYS2d 601]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CALVIN BATTLES, Appellant.

Argued November 15, 2010; decided December 14, 2010

## POINTS OF COUNSEL

*Calvin Battles*, appellant pro se. I. Appellant was denied his due process right to a fair trial when nisi prius court failed to follow the mandate of CPL 310.50. (*People v Salemmo*, 38 NY2d 357; *People v Tucker*, 55 NY2d 1; *People v Worthy*, 178 AD2d 454.) II. Appellant was denied his due process right to a fair trial when the prosecutor allowed its witness to testify falsely about material issues in the case and failed to correct this false and misleading testimony. (*People v Pelchat*, 62 NY2d 97; *Mooney v Holohan*, 294 US 103; *People v Steadman*, 82 NY2d 1; *People v Savvides*, 1 NY2d 554.) III. Appellant was denied his constitutional right to effective assistance of counsel when counsel failed to make a timely objection to the court's faulty misstatement of a witness's testimony or otherwise object to the court's erroneous rulings. (*Strickland v Washington*, 466 US 668; *People v Paul*, 212 AD2d 1020; *People v Yut Wai Tom*, 53 NY2d 44; *People v Cooper*, 96 AD2d 866; *People v Johnson*, 79 Misc 2d 880; *People*

*v Feingold*, 7 NY3d 288; *People v Payne*, 3 NY3d 266; *People v Wall*, 29 NY2d 863; *People v Suarez*, 6 NY3d 202; *People v Gallagher*, 69 NY2d 525.)

*Legal Aid Society*, New York City (*Svetlana M. Kornfeind, Steven Banks* and *Andrew C. Fine* of counsel), for appellant. I. The trial court's imposition of consecutive sentences was illegal under Penal Law § 70.25 (2), where appellant committed multiple offenses through his "single act" of starting a fire. (*People v Rosas*, 8 NY3d 493; *People v Ramirez*, 89 NY2d 444; *People v Snyder*, 241 NY 81; *People v Day*, 73 NY2d 208; *People v Underwood*, 52 NY2d 882; *People v Laureano*, 87 NY2d 640; *People v Ruiz*, 291 AD2d 418; *People v Lopez*, 262 AD2d 659; *People v Feingold*, 7 NY3d 288; *People v Kirkwood*, 165 AD2d 881.) II. In sentencing appellant as a discretionary persistent felony offender to increased sentences on the assault counts, the court based its determination on facts other than recidivism by a mere preponderance of the evidence, thereby denying appellant his constitutional rights to due process and a jury trial. (*Apprendi v New Jersey*, 530 US 466; *Cunningham v California*, 549 US 270; *United States v Booker*, 543 US 220; *Blakely v Washington*, 542 US 296; *Ring v Arizona*, 536 US 584; *People v Quinones*, 12 NY3d 116; *People v Daniels*, 5 NY3d 738; *People v Rivera*, 5 NY3d 61; *People v Rosen*, 96 NY2d 329.)

*Charles J. Hynes, District Attorney*, Brooklyn (*Solomon Neubort* and *Leonard Joblove* of counsel), for respondent. I. The imposition of consecutive sentences was proper because separate and distinct acts underlay each of the crimes and the acts constituting each crime were not material elements of any of the other crimes. (*People v Laureano*, 87 NY2d 640; *People v Brown*, 80 NY2d 361; *People v Di Lapo*, 14 NY2d 170; *People v Ramirez*, 89 NY2d 444; *People v Rosas*, 8 NY3d 493; *People v Day*, 73 NY2d 208; *People v Ford*, 11 NY3d 875; *People v Sala*, 95 NY2d 254; *People v Dekle*, 56 NY2d 835; *People v Hernandez*, 82 NY2d 309.) II. Defendant's challenge to the constitutionality of his sentencing as a discretionary persistent felony offender is unpreserved and meritless. (*Apprendi v New Jersey*, 530 US 466; *People v Rosen*, 96 NY2d 329, 534 US 899; *People v Rivera*, 9 NY3d 904; *Brown v Greiner*, 409 F3d 523; *Brown v Miller*, 451 F3d 54, 549 US 1120; *Estelle v McGuire*, 502 US 62; *Almendarez-Torres v United States*, 523 US 224; *Cunningham v California*, 549 US 270; *Blakely v Washington*, 542 US 296; *People v Quinones*, 12 NY3d 116.)

OPINION OF THE COURT

PIGOTT, J.

One person was burned to death and three others severely burned as a result of defendant's pouring gasoline over several individuals and setting a fire. The primary issue before us is whether, under the facts of this case, following defendant's conviction, the court's sentencing of defendant to consecutive terms of imprisonment was proper. A review of the evidence presented at trial is necessary.

On July 8, 2004 and into the early next morning, several people, including Gregory Davis, Ronald Davis, and Stephen Wheeler, were at Arthur Elliott's apartment, a known crack cocaine den. Defendant Calvin Battles arrived, and at some point got into an argument with Ronald Davis. Defendant left, but later returned, threatening to burn the place. Then using a gasoline can that had been retrieved from his truck, defendant, lighter in hand, began splashing gasoline throughout the apartment. Defendant pushed Ronald Davis to the floor and doused him with gasoline. He then poured gasoline over Gregory Davis's head. After exchanging words with Elliott, defendant threw gasoline on him as well.

As defendant attempted to ignite the lighter, Elliott pushed defendant, who was in the doorway, out of the apartment. Defendant and Elliott scuffled and a fire broke out. The lower part of Elliott's body burst into flames as he fell back into the apartment, igniting the entire living room. As a result, Ronald Davis was burned to death and Gregory Davis, Stephen Wheeler and Arthur Elliott sustained severe burns.

After a jury trial, defendant was convicted of depraved indifference murder (Penal Law § 125.25 [2]), second-degree manslaughter (Penal Law § 125.15 [1]), and three counts of depraved indifference assault (Penal Law § 120.10 [3]). He was sentenced as a persistent felony offender to concurrent sentences of 25 years to life on the depraved indifference murder and manslaughter convictions, to be followed by consecutive terms of 25 years to life on the depraved indifference assault convictions related to Gregory Davis and Wheeler, and a consecutive term of 20 years to life on the depraved indifference assault conviction related to Elliott, for an aggregate sentence of 95 years to life.

Defendant appealed, asserting, among other claims, that the imposition of consecutive sentences was illegal because the victims were all burned in a fire that had a single source of

ignition, and that his sentencing as a persistent felony offender was unconstitutional under *Apprendi v New Jersey* (530 US 466 [2000]).

The Appellate Division modified the judgment by vacating the conviction of second-degree manslaughter (*see* Penal Law § 125.15 [1]) and the sentence imposed thereon, and otherwise affirmed (65 AD3d 1161 [2d Dept 2009]). As relevant to this appeal, the court held that defendant's *Apprendi* claim was unpreserved and without merit (*id.* at 1162). The court further rejected, without discussion, defendant's consecutive sentencing claim as without merit (*id.*).

A Judge of this Court granted leave to appeal (13 NY3d 905 [2009]) and we now modify.

Defendant contends that the consecutive sentences for the depraved indifference murder and depraved indifference assault counts are illegal under Penal Law § 70.25 (2) because those crimes shared a common actus reus—defendant's single act of starting the fire.

Penal Law § 70.25 requires that concurrent sentences be imposed "for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other" (Penal Law § 70.25 [2]). To determine whether consecutive sentences are permitted, a court must first look to the statutory definitions of the crimes at issue (*People v Frazier*, 16 NY3d 36 [2010] [decided today]).

Here, the inquiry begins with the depraved indifference murder statute, which requires proof that "under circumstances evincing a depraved indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person" (Penal Law § 125.25 [2]). The statutory definition of depraved indifference assault (Penal Law § 120.10 [3]) differs from that of depraved indifference murder only in the result created by defendant's conduct: serious physical injury to another.

The imposition of consecutive sentences was permissible in this case with respect to Ronald Davis, Gregory Davis and Elliott because separate acts constituted the actus reus of each of the depraved indifference crimes against those victims. Specifically, the trial judge instructed the jurors that they could find defendant acted with depraved indifference to human life

irrespective of whether they were to find that defendant was the one who ignited the fire. Defendant's acts of soaking each victim with gasoline in a room where other people were present, and where one of them (Elliott) was smoking a lit cigarette, were so inherently dangerous to each victim that defendant was found guilty of depraved indifference murder and depraved indifference assault based on those acts alone. A determination of the cause of the ignition of the fire was unnecessary to the determination of defendant's guilt with respect to those depraved indifference counts, and thus, defendant's argument that the actus reus for all of those crimes was the ignition of the fire fails. Because defendant engaged in conduct which created a grave risk of death or serious physical injury to each of those victims, by separate and distinct acts of dousing them with gasoline, imposition of consecutive sentences was authorized under the Penal Law.

We conclude, however, that the sentence imposed pertaining to Wheeler must run concurrent to the other sentences. Wheeler was never doused with gasoline, but rather, was sprayed as a result of the dousing of the others. Thus, the risk-creating conduct for his conviction was the same act as that of the others and running his sentence concurrently is required.

Defendant's challenge to the constitutionality of his sentencing as a persistent felony offender and other claims raised in his pro se brief are without merit (*see People v Quinones*, 12 NY3d 116 [2009]; *see also People v Bell*, 15 NY3d 935 [2010] [decided today]).

Accordingly, the order of the Appellate Division should be modified and the case remitted to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.

Chief Judge LIPPMAN (dissenting in part). Although at common law the right to a jury determination of all facts essential to punishment was jealously guarded (*see e.g. People ex rel. Cosgriff v Craig*, 195 NY 190 [1909]), more recent history in this and many other states has witnessed judicial acquiescence in legislative initiatives that effectively resituate fact-finding power necessary to the justification of punishment from the jury to judges. This transfer has been effected most frequently by statutes permitting the enhancement of otherwise prescribed sentences based on judicial findings, often by a mere preponderance, respecting a defendant's criminal history, the circum-

stances of the offense before the court, and what the statutorily relevant findings collectively portend respecting the risk posed by the defendant's eventual reintroduction to society. It was widely believed that these kinds of findings fell comfortably within the discretionary power judges have traditionally exercised in sentencing criminal defendants and that they neither diminished the fact-finding prerogative of the jury nor compromised the Sixth Amendment right to a jury trial. This perception we now know was wrong, indeed dramatically so. In *Apprendi v New Jersey* (530 US 466 [2000]) the Supreme Court held that "[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt" (*id.* at 490 [internal quotation marks and citation omitted]). And, subsequently, in *Ring v Arizona* (536 US 584 [2002]), *Blakely v Washington* (542 US 296 [2004]) and *Cunningham v California* (549 US 270 [2007]), the Court made it unambiguously clear that judicial authority to impose punishment was constitutionally tied to and limited by the jury verdict and any admissions by defendant. In *Blakely*, the Court, citing *Ring*, stated emphatically, "[o]ur precedents make clear . . . that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*" (542 US at 303), and in *Cunningham* it reiterated that "[i]f the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact *to impose* the longer term, the Sixth Amendment requirement is not satisfied" (549 US at 290 [emphasis added]).

The rule of *Apprendi* is not so much a limitation on the power of judges, but a reassertion of the prerogative constitutionally reserved to the jury to determine facts necessary to the imposition of punishment at a prescribed level. Only a single exception to this rule of constitutional power allocation has been recognized and that is the "narrow" one carved out in *Almendarez-Torres v United States* (523 US 224 [1998]), where judicially effected sentence enhancements based solely on proof of prior convictions were permitted (*see Apprendi*, 530 US at 490).

At issue here is the constitutional validity of sentence enhancements imposed pursuant to New York's statutes governing the sentencing of persistent felony offenders (CPL 400.20; Penal Law § 70.10). Enhanced sentencing under these provi-

sions is conditioned upon a jury verdict convicting a defendant of a felony *and* two judicial findings described in CPL 400.20 (1):

> "Such sentence *may not be imposed unless, based upon evidence in the record* of a hearing held pursuant to this section, *the court* (a) has found that the defendant is a persistent felony offender as defined in subdivision one of section 70.10 of the penal law, *and (b) is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct are such that extended incarceration and lifetime supervision of the defendant are warranted to best serve the public interest*" (emphasis added).

Finding "a" must be made on proof beyond a reasonable doubt. Finding "b," however, may under the statute rest on a mere preponderance of the evidence (CPL 400.20 [5]).

On its face, this provision raises *Apprendi* issues, since it appears to afford a judge power to impose an enhanced sentence based upon facts not found by the jury or within the *Almendarez-Torres* carve-out, and to make the findings upon which the statutory enhancement is evidently conditioned on less than proof beyond a reasonable doubt. The constitutionality of sentences imposed under this sentencing scheme has, not surprisingly, been a practically constant subject of litigation since *Apprendi*.

In *People v Rosen* (96 NY2d 329 [2001], *cert denied* 534 US 899 [2001]), and subsequently in more extended form in *People v Rivera* (5 NY3d 61 [2005], *cert denied* 546 US 984 [2005]) and *People v Quinones* (12 NY3d 116 [2009], *cert denied* 558 US —, 130 S Ct 104 [2009]), we upheld judicially enhanced, persistent felony offender sentences upon the following reasoning: a defendant's status as a persistent felony offender is determined solely on the basis of his or her prior convictions (*see* Penal Law § 70.10 [1] [a]), the fact of which, pursuant to *Almendarez-Torres*, may be proved in a non-jury proceeding; that status having been permissibly established by a judge, the defendant, without more, is "subject to" or "eligible for" enhanced sentencing, with the final determination as to whether he or she should be sentenced within the now available enhanced sentencing range depending upon the discretion of the sentencing judge exercised in accordance with the criteria set forth in subsection (b) of CPL 400.20 (1) (*supra*). We characterized this mandatory

exercise of discretion (see CPL 400.20 [9]) as nothing more remarkable than the setting of a sentence within a permissible range based on traditionally considered sentencing factors.

This rationale has, in turn, been the focus of extensive federal habeas litigation. In March of this year a unanimous panel of the Second Circuit found that its persistence was unreasonable subsequent to the Supreme Court's decision in *Blakely*, and, accordingly, that our decisions in *Rivera* and *Quinones* misapplied clearly established Supreme Court precedent (*Besser v Walsh*, 601 F3d 163 [2010]). *Besser*, however, was shortlived. After en banc reconsideration, it was vacated by the Second Circuit in a divided ruling (*Portalatin v Graham*, 624 F3d 69 [2010]). *Portalatin*, though, hardly places a federal imprimatur upon our *Apprendi* jurisprudence. It was decided under the extraordinarily deferential review standard applicable in federal habeas proceedings pursuant to the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996 (Pub L 104-132, 110 US Stat 1214) and, accordingly, was issued with the remarkable AEDPA caveat,

> " 'we decide not whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court's interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time.' *Policano v. Herbert*, 507 F.3d 111, 115 (2d Cir.2007)" (*Portalatin*, 624 F3d at 79).

We agreed to hear the current round of appeals containing *Apprendi* issues subsequent to *Besser* but before *Portalatin*. And, while I think it safe to say that we would not have consented to revisit the *Apprendi* issues raised by New York's persistent felony offender sentencing scheme had we anticipated *Besser*'s vacatur, it seems to me that the question left undecided by *Portalatin*, namely, whether our interpretation of the controlling holdings of the United States Supreme Court has been correct, merits yet another close look. I do not believe that our persistent felony offender sentencing provisions can ultimately survive constitutional scrutiny and, practically, see nothing to be gained, and much to be lost, in clinging, during what will undoubtedly be further protracted litigation, to a legally flawed sentencing scheme whose entirely proper objectives are capable of being met without constitutional offense. Numerous states with similarly flawed sentencing provisions have taken the judicial and, presumably, the legislative measures necessary to

bring their sentencing statutes into agreement with *Apprendi* (*see State v Bell*, 283 Conn 748, 931 A2d 198 [2007]; *State v Lewis*, 590 A2d 149 [Me 1991]; *State v Foster*, 109 Ohio St 3d 1, 845 NE2d 470 [2006]; *State v Fairbanks*, 688 NW2d 333 [Minn Ct App 2004]; *State v Maugaotega*, 115 Haw 432, 168 P3d 562 [2007]; *State v Frawley*, 143 NM 7, 172 P3d 144 [2007]; *State v Gomez*, 239 SW3d 733 [Tenn 2007]; *State v Price*, 217 Ariz 182, 171 P3d 1223 [2007]). There is no reason why New York should not do so as well.

As Chief Judge Kaye and Judge Ciparick pointed out in their dissents in *Rivera*, *Rosen*'s attempt at harmonizing New York's persistent felony offender sentencing scheme with *Apprendi* was, at the time, at least arguably viable. *Walton v Arizona* (497 US 639 [1990]), although cast in doubt by *Apprendi*, had not yet been overruled, and *Walton* seemed to support the notion, essential to *Rosen*'s rationale, that a defendant's mere eligibility for an enhanced sentence was sufficient to vest a judge with authority to impose such a sentence, notwithstanding the need for a further judicial finding to actually permit the sentence. Once *Walton* was overruled by *Ring*, however, our ensuing cases, *Rivera* and *Quinones*, were deprived of essential support, for *Ring*, applying *Apprendi*, held that where a jury verdict was not itself sufficient to support the punishment—where the imposition of punishment could not go forward before some additional judicial finding was made—the punishment could not be constitutionally imposed (536 US at 602). This basic point— that the power of the judge to *impose* a particular sentence derives from and can be no greater than that afforded by the verdict (or the defendant's admissions)—was, as noted, forcefully reiterated in *Blakely* (542 US at 303) and *Cunningham* (549 US at 290) and, indeed, characterized in both decisions as a "bright line" rule.

Under the New York persistent felony offender sentencing scheme, it is obvious that, even after a defendant has been found a persistent felony offender by reason of a guilty verdict and *Almendarez-Torres*-sheltered judicial findings as to prior felony convictions, he or she still may not be given an enhanced, class A-I felony sentence. Regardless of whether the defendant is at that point theoretically eligible for or subject to enhanced sentencing, the actual power to impose such a sentence cannot be deemed to have accrued under *Apprendi* because the enhanced punishment is not statutorily authorized "solely on the basis of the facts reflected in the jury verdict or admitted

[or on the basis of prior convictions]"; it depends as well on the additional, not yet made discretionary findings as to the defendant's history, character and the circumstances of the crime(s) expressly mandated by the statute (*see* CPL 400.20 [1], [9]). The statute is clear that, absent those findings, a defendant must be sentenced as a second felony offender (*see* CPL 400.20 [10]).

The task set the sentencing judge by the statute, then, is not, properly understood, one of exercising discretion to situate a sentence within an already permissible enhanced range; it is rather one of determining whether, after prior convictions have been taken into account, there exists a factual predicate to access the enhanced range and impose a sentence exceeding that which could be imposed based on the jury verdict and the defendant's admissions alone. This judicial exercise, at once removing from the jury the power constitutionally reserved to it to assess facts that increase the prescribed range of penalties to which a defendant is exposed (*Apprendi*, 530 US at 490) and depriving the defendant of his right to a jury trial at which the prosecution must prove each and every element essential to justify the sentence beyond a reasonable doubt, lies squarely within *Apprendi*'s prohibition.

While this Court has characterized the discretionary findings described in CPL 400.20 (1) (b) as inessential to eligibility for enhanced sentencing (*Rivera*, 5 NY3d at 68), that is not a constitutionally significant gloss. It does not and cannot alter the essential constitutional defect in the statute, namely, that there is no reading of it under which the subsection (b) judicial determination—one clearly necessitating findings significantly more far-reaching than the recidivism findings already made pursuant to the statute's subsection (a), and going well beyond the facts conceivably established by a verdict or admitted by the defendant—may be deemed dispensable to the actual *imposition* of an enhanced sentence.

Even if it were possible to imagine a case such as was hypothesized in *Rivera* (5 NY3d at 70-71), in which a persistent felony offender sentence was, in accordance with the statute, based solely on the verdict and *Almendarez-Torres*-sheltered findings—and, given the nature of the judicial "opinion" required by the statute this appears impossible—it would remain that the natural and nearly inevitable effect of this enactment is that judges, and not juries, are cast in the role of making factual findings upon which the imposition of a sentence in an enhanced range depends. It does not matter whether these

findings themselves require the sentence or whether, as the *Rivera* court seemed to find significant, they merely permit a sentence the basis for which has otherwise been established; in either case they are necessary to the enhancement's imposition and under *Apprendi* may not be constitutionally taken from the jury and committed to a judge (*Blakely*, 542 US at 305 n 8). Under *Apprendi*, "the relevant inquiry is not one of form, but of effect" (530 US at 494), and the effect of New York's persistent felony offender sentencing statutes, as distinguished from any abstract scenario of benign application, is that defendants are, in their ministration, regularly exposed to punishment greater than that which could be imposed upon the jury verdict, the defendant's admissions and prior convictions alone. It is to this real effect that our jurisprudence should respond.

This case provides a vivid example of impermissible judicial fact-finding in support of sentence enhancement. The jury acquitted defendant of two felony murder counts, evidently upon the finding that the underlying felony, arson, had not been established. And, indeed, the central issue at trial had been whether defendant actually set the fatal blaze or whether it started as an unintended consequence of a victim's cigarette coming into contact with a gasoline-doused surface. In the postverdict sentencing proceedings, however, the court, in the course of setting upon the record his findings in support of the enhanced sentences he was about to impose, stated: "The circumstances surrounding this case, I mean, let us think about this: Going in and pouring gasoline on a person, *lighting that gasoline*, killing and maiming these people, if that is not a heinous crime, I don't know what is" (emphasis added).

The judicial fact-finding in this case did not merely supplement the verdict, as ordinarily occurs in consequence of following the statute, it materially differed from, indeed conflicted with it. The court's crucial enhancement finding that defendant lit the gasoline was one that the jury specifically declined to make when it acquitted defendant on the arson-based counts. It is one thing for a court to make enhancement findings that add to the predicate supplied by the verdict, defendant admissions and prior convictions—that is objectionable enough under *Apprendi*—it is quite another when the court's findings essentially nullify a critical component of the verdict. Yet, under this statute that can happen because the judge is directed to form an "opinion" respecting "the nature and circumstances of [the defendant's] criminal conduct" and may, unlike the jury, do so

upon a mere preponderance of the evidence. Here, the transfer of essential fact-finding power from the jury to the judge has achieved undoubted perfection and is on numerous counts undoubtedly unconstitutional. It will suffice for present purposes to observe that this sort of fact-finding is absolutely antithetical to the Sixth Amendment guarantee of a jury trial and is, of course, quintessentially violative of *Apprendi.*

Inasmuch as it appears clear that defendant was unconstitutionally deprived of a jury determination of facts essential to justify his enhanced sentences, lack of preservation should not be deemed an impediment to our consideration of his *Apprendi*-based arguments. There can be no more pronounced a departure from the mode of proceedings prescribed by law than the denial of a criminal defendant's right to have each and every element necessary to imposition of the authorized punishment proved to a jury beyond a reasonable doubt. The rules of preservation are not legitimately interposed to avoid such a fundamental claim (*see People v Patterson,* 39 NY2d 288, 295 [1976], *affd* 432 US 197 [1977]), and our cases, fairly construed, have not so held. We have held that the challenged sentencing scheme does not involve an *Apprendi* violation, we have not held that a meritorious *Apprendi* claim would be unreviewable for lack of preservation.

The Supreme Court in *Cunningham* had occasion to describe the rationale offered by the California Supreme Court in *People v Black* (35 Cal 4th 1238, 113 P3d 534 [2005]) in justification of the fact-finding role assigned the judge by the California Legislature under the Determinate Sentencing Law (DSL):

> "In that court's view, the DSL survived examination under our precedent intact. See 35 Cal. 4th, at 1254-1261, 113 P. 3d, at 543-548. The *Black* court acknowledged that California's system appears on surface inspection to be in tension with the rule of *Apprendi. But in 'operation and effect,' the court said, the DSL 'simply authorize[s] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range.' 35 Cal. 4th, at 1254, 113 P. 3d, at 543. Therefore, the court concluded, 'the upper term is the "statutory maximum" and a trial court's imposition of an upper term sentence does not violate a defendant's right to a jury trial under the*

*principles set forth in Apprendi, Blakely, and Booker.'*
*Ibid.* . . .

"The Black court's conclusion that the upper term, and not the middle term, qualifies as the relevant statutory maximum, rested on several considerations. First, *the court reasoned that, given the ample discretion afforded trial judges to identify aggravating facts warranting an upper term sentence, the DSL*

" 'does not represent a legislative effort to shift the proof of particular facts from elements of a crime (to be proved to a jury) to sentencing factors (to be decided by a judge). . . . Instead, it afforded the sentencing judge the discretion to decide, with the guidance of rules and statutes, whether the facts of the case and the history of the defendant justify the higher sentence. Such a system does not diminish the traditional power of the jury.' Id., at 1256, 113 P. 3d, at 544 (footnote omitted)" (549 US at 289-290 [emphasis added]).

To this now all too familiar account by a state high court of its justification for retaining, subsequent to *Apprendi*, a sentencing scheme reposing essential fact-finding power in a judge rather than a jury, the *Cunningham* court replied,

"We cautioned in *Blakely*, however, that broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in any particular case, does not shield a sentencing system from the force of our decisions. If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact *to impose* the longer term, the Sixth Amendment requirement is not satisfied. 542 U.S., at 305, and n. 8" (549 US at 290 [emphasis added]).

There is for *Apprendi* purposes no material difference between the California DSL and our persistent felony offender sentencing statutes. Nor is there any significant difference in the reasoning in our cases and that offered by the California Supreme Court in *Black*. While perhaps through some jurisprudential fluke our sentencing scheme will ultimately be spared the fate of the California DSL, I do not think it prudent to count on it.

Accordingly, while I concur with the majority's modification, I dissent in part and would further modify the appealed order. Defendant is, in my view, entitled to the vacatur of his sentences on the first-degree assault counts and should be resentenced on those counts as a second felony offender.

JONES, J. (dissenting in part). Because I believe that defendant's sentences as to all four victims should be modified to run concurrently, I respectfully dissent.

In holding that consecutive sentences were authorized with respect to three of the victims "[b]ecause defendant engaged in conduct which created a grave risk of death or serious physical injury to each of those victims[ ] by separate and distinct acts of dousing them with gasoline" (majority op at 59), the majority focused on a small portion of the trial court's jury instruction applicable only to count 2 on the verdict sheet (i.e., the depraved indifference murder count). According to the majority, the trial court instructed the jurors that they could find defendant acted with depraved indifference to human life even if they did not find that defendant ignited the fire (*see id.*). Based on this instruction, the majority posited that

> "[d]efendant's acts of soaking each victim with gasoline in a room where other people were present, and where one of them . . . was smoking a lit cigarette, were so inherently dangerous to each victim that defendant was found guilty of depraved indifference murder and depraved indifference assault based *on those acts alone*" (*id.* [emphasis added]).

I disagree. In my view, the majority's holding is contrary to our precedent interpreting the "act or omission" under Penal Law § 70.25 (2) as the actus reus of the particular criminal offense (*see People v Laureano*, 87 NY2d 640, 643 [1996]; *People v Rosas*, 8 NY3d 493, 496, 497 [2007]).[1] Specifically, the majority incorrectly upheld the imposition of consecutive sentences for depraved indifference murder and depraved indifference assault based on what amounts to separate acts of depraved indifference reckless endangerment.

Penal Law § 70.25 (2) provides that concurrent sentences must be imposed when two or more offenses are committed

---

1. Actus reus (Latin for "guilty act") is defined as "[t]he wrongful deed that comprises the physical components of a crime and that generally must be coupled with *mens rea* to establish criminal liability" (Black's Law Dictionary 41 [9th ed 2009]).

"through a single act or omission" or "through an act or omission which in itself constituted one of the offenses and also was a material element of the other." In *People v Ramirez* (89 NY2d 444 [1996]), this Court explained that "[s]ection 70.25 (2) does not prohibit convictions of multiple offenses containing overlapping elements. Rather, the statute prohibits double punishment for an act or omission which violates more than one section of the law and is accordingly punishable in different ways" (89 NY2d at 451 n 5). To determine whether concurrent sentences are required, this Court instructed that

> "[a] sentencing court must first examine the statutory definitions of the crimes for which defendant has been convicted. Because both prongs of Penal Law § 70.25 (2) refer to the 'act or omission,' that is, the *'actus reus'* that constitutes the offense (*see,* Penal Law § 15.00 [1] [bodily movement]; Penal Law § 15.00 [3] [failure to act]), the court must determine whether the *actus reus* element is, by definition, the same for both offenses (under the first prong of the statute), or if the *actus reus* for one offense is, by definition, a material element of the second offense (under the second prong). If it is neither, then the People have satisfied their obligation of showing that concurrent sentences are not required. If the statutory elements do overlap under either prong of the statute, the People may yet establish the legality of consecutive sentencing by showing that the 'acts or omissions' committed by defendant were separate and distinct acts" (*Laureano,* 87 NY2d at 643 [case citations omitted]).

That is, when a defendant is convicted of multiple offenses, the sentencing court, in addition to reviewing the Penal Law provisions under which defendant was convicted, must review the relevant evidence adduced at trial and the trial court's jury charge to determine whether any of the crimes for which defendant was convicted were single act offenses (for concurrent sentencing purposes).

Analysis must begin with the language of the depraved indifference murder and assault statutes. Under Penal Law § 125.25 (2),

> "[a] person is guilty of murder in the second degree when . . . [u]nder circumstances evincing a depraved indifference to human life, he recklessly

engages in conduct which creates a grave risk of
death to another person, and thereby [i.e., as a
result of that conduct] causes the death of another
person."

The statutory definition of depraved indifference (first-degree)
assault differs from depraved indifference murder only in the
result caused by defendant's conduct, i.e., "serious physical
injury to another person" (Penal Law § 120.10 [3]). Examining
these statutory definitions, the entire actus reus of depraved
indifference murder is that defendant recklessly engaged in
conduct which created a grave risk of death to Ronald Davis,
*and as a result of that conduct caused the death of Ronald Da-
vis*; while the entire actus reus of depraved indifference assault
is that defendant recklessly engaged in conduct which created a
grave risk of death to Elliott, Wheeler and Gregory Davis, *and
as a result of that conduct caused serious physical injury to
those three individuals*.

Although a consecutive sentence may be authorized "if the
Legislature has seen fit to provide that up to a particular point
the acts of the defendant constitute one crime and that the acts
of the defendant, committed thereafter, constitute a second
crime and that each series of acts constitut[e] a separate crime"
(*Rosas*, 8 NY3d at 498 [citation and internal quotation marks
omitted]), such a sentence is not permissible under these facts.
Here, the same "single act" (i.e., the same actus reus) of caus-
ing the fire is the basis for defendant's convictions of depraved
indifference murder and depraved indifference assault.

In *People v Rosas*, this Court held that the sentences imposed
on defendant, who was convicted of two counts of first-degree
murder under Penal Law § 125.27 (1) (a) (vii) for causing the
deaths of two individuals during the same criminal transaction,
must be served concurrently. *Rosas* provides support for the
proposition that the actus reus for a depraved indifference of-
fense is the act in a series of risk-creating acts that is both nec-
essary and sufficient to cause the result for which defendant
will be held criminally liable (*see Rosas*, 8 NY3d at 499 [Regard-
ing the statutory definition of "act" in Penal Law § 15.00 (1)
("a bodily movement"), the *Rosas* majority noted that the
purpose of the statutory definition "draws a line between a
prohibited 'act'—'a bodily movement,' or actus reus—and a
'(c)ulpable mental state' (Penal Law § 15.00 [6])—a state of
mind, or mens rea. The statute could not have been designed to
require courts to distinguish between one and several bodily

movements, because the distinction will be difficult or impossible in many cases as the dissent recognizes"]; *Rosas*, 8 NY3d at 503 n 4 [The dissent noted, "for sentencing purposes, we need concern ourselves only with the particular act(s) that fulfill the act element(s) of the offense of which a defendant is charged. For example, to accomplish a second-degree intentional murder, a single act offense, a defendant necessarily engages in many bodily acts—but the only one the People must prove to support the conviction is the act that causes the victim's death"]).

Here, causing the fire was the act defendant needed to perform in order to cause the criminal results of which he was convicted—the death of Ronald Davis and the serious burn injuries to Elliott, Wheeler and Gregory Davis. Accordingly, the only act the People had to prove to support the depraved indifference convictions was the act that caused Ronald Davis' death and the other victims' serious physical injuries—that is, defendant's single act of igniting the fire. The acts that preceded defendant's ignition of the fire—pouring, splashing, or throwing gasoline on the victims and around the room—while essential components of the risk-creating conduct, cannot be the basis of the sentencing determination under section 70.25 (2) because these acts were insufficient to complete the crimes of which he was convicted. In "actus reus" terms, these acts amount to conduct which created a grave risk of death; conduct which the People concede supports a conviction for depraved indifference reckless endangerment. Further, while the death and serious physical injuries sustained by the victims logically could have occurred in the absence of defendant's separate acts of pouring, splashing, or throwing gasoline, they could not have occurred without defendant's *single* act of causing the fire.

The fact that defendant was acquitted of two felony murder counts based on the jury's finding that the underlying felony, arson in the second degree,[2] was not established by the People does not require a different conclusion. For purposes of determining whether concurrent or consecutive sentences were warranted for defendant's convictions of the instant depraved

---

2. Penal Law § 150.15 provides:
   "A person is guilty of arson in the second degree when he intentionally damages a building or motor vehicle by starting a fire, and when (a) another person who is not a participant in the crime is present in such building or motor vehicle at the time, and (b) the defendant knows that fact or the circumstances are such as to render the presence of such a person therein a reasonable possibility."

indifference offenses, his *single* act of causing the fire need not have been an intentional act. The jury's finding that defendant was guilty of the depraved indifference counts was not dependent on whether defendant intentionally set the fire. Given the evidence that the fire ignited directly after defendant, with lighter in hand, pushed Elliott who fell back into the gasoline-soaked living room, it is reasonable to conclude the jury found that defendant recklessly caused the fire through an act of depraved indifference.[3]

The majority and People contend that consecutive sentencing was permissible because the jury, as charged, could have found that defendant's separate acts of dousing the victims with gasoline constituted the relevant *"acts"* for the depraved indifference crimes, regardless of whether the jury also found that defendant, through a single act, caused the fire. However, in order to justify consecutive sentencing based on separate and distinct acts, the People must identify "the facts which support their view" (*see Laureano*, 87 NY2d at 644 [citation omitted]). In establishing this claim, the People "may offer facts from the trial record" (*id.* [citation omitted]). Here, the People have not identified any such supporting facts. To the contrary, upon finding that defendant poured, splashed, or threw gasoline on Ronald Davis, Elliott, Wheeler and Gregory Davis, the jury also had to find that defendant's "act" *caused* Ronald Davis' burn-related death, and the serious burn injuries sustained by Elliott, Wheeler and Gregory Davis. Defendant's act which caused the fire—the pushing of Elliott to the floor—was the only causative "act" adduced at trial.

Further, the majority's and People's reliance on the stated jury instruction is problematic. First, this jury instruction should have been objected to by defendant's trial counsel because it allowed the jury to find defendant guilty of depraved indifference murder on proof of an act (i.e., the pouring or splashing of a flammable liquid) that only supports the crime of depraved indifference reckless endangerment. Second, this instruction, which only applied to the depraved indifference murder count, was not given for (and is therefore inapplicable to) the depraved indifference assault counts.

In addition, the jury was specifically instructed that in order to convict defendant of a charged offense, it must find that the

---

**3.** As we noted in *People v Feingold* (7 NY3d 288, 294 [2006]), "depraved indifference to human life[, like intent,] is a culpable mental state."

People proved each element of the particular criminal offense beyond a reasonable doubt. For example, the jury was instructed to find defendant not guilty of depraved indifference assault if the People failed to prove beyond a reasonable doubt that the defendant caused serious physical injury to Gregory Davis, Elliott and Wheeler. As stated, the only causative "act" adduced at trial was defendant's single act of causing the fire. Thus, the trial court's charge, when read as a whole, makes clear that defendant's single act of causing the fire was not insignificant for purposes of holding defendant criminally liable (at least for the depraved indifference assault counts). Based on the foregoing, the argument put forth by the majority and People that each of the depraved indifference assault counts was complete as soon as defendant doused the respective victims with gas necessarily fails.

Under the majority's theory, sentencing judges would be allowed to select and designate specific preliminary acts as the operative actus reus in depraved indifference crimes so as to thwart the requirement of concurrent sentencing for a "single act" and permit consecutive sentencing. Not only would this be contrary to this Court's long-settled interpretation of section 70.25 (2) and violative of the legislative intent of the statute, it would create uncertainty in the law because application of section 70.25 (2) would depend on the depravity of defendant in committing certain preliminary acts.

Accordingly, the People failed to meet their burden of establishing the legality of the consecutive sentences imposed on defendant because defendant's "single act" of causing the fire was the basis for his convictions of depraved indifference murder and depraved indifference assault. Penal Law § 70.25 (2) prohibits consecutive punishment for such a single act.

Judges CIPARICK, GRAFFEO, READ and SMITH concur with Judge PIGOTT; Chief Judge LIPPMAN dissents in part in a separate opinion; Judge JONES dissents in part in another opinion.

Order modified, etc.