This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------

No. 82
The People &c.,
                Respondent,
         v.
Sean Garvin,
                Appellant.

                Tammy E. Linn, for appellant.
                Danielle S. Fenn, for respondent.
                National Association of Criminal Defense Lawyers et
al., amici curiae.

STEIN, J.:

        In this case, we are asked to overrule our prior

decisions holding that a warrantless arrest of a suspect in the

threshold of a residence is permissible under the Fourth

Amendment, provided that the suspect has voluntarily answered the

door and the police have not crossed the threshold.  We decline

- 1 -

to do so, and now reaffirm our longstanding rule.

                               I.

        Defendant was convicted of four counts of third-degree robbery and one count of attempted third-degree robbery in connection with a string of bank robberies.  He was arrested without a warrant inside the doorway of his home on the same day that police obtained a match for his fingerprint on a demand note used during one of the robberies.  The arresting officer testified that he was instructed by a detective to go to defendant's residence to arrest him.  Upon arriving there, three officers in plain clothes walked to the top of an interior staircase in the two-family house, while two detectives went to the rear of the building.  One of the officers knocked on the apartment door, which was opened by another person in the residence.  The officer did not know whether defendant lived on the first or the second floor and, because she did not recognize defendant when he appeared in the doorway, the officer asked if his girlfriend lived there.[1]  After defendant stated that his girlfriend was not there and closed the door, the officers walked down the stairs, and the arresting officer announced that he had recognized defendant from a photograph.  The officers then returned to the apartment door.

        The arresting officer knocked on the door, and

_____

        [1] Police had also obtained a fingerprint from defendant's girlfriend on a demand note used in one of the robberies.

defendant opened it.  While defendant was standing in the doorway of his apartment, the officer told him that he was under arrest and, when defendant turned around and put his hands behind his back, the officer handcuffed him.  The officer did not enter defendant's apartment -- he placed the handcuffs on defendant as defendant stood in the doorway.  Defendant was transported to the precinct, where he waived his Miranda rights, agreed to speak with the detectives, and initially denied involvement in the robberies.  After the investigating detective informed defendant that both his and his girlfriend's fingerprints were found on demand notes recovered from the locations of the robberies, defendant confessed.

At his subsequent suppression hearing, defendant argued that the police violated Payton v New York (445 US 573 [1980]) by entering his home without consent or a warrant; he maintained that there was an absence of exigent circumstances once police had surrounded the home so that he could not leave.  He further asserted that the police did not wait for him to exit the premises before he was arrested, and that the police had ample time to obtain an arrest warrant, but did not do so because they wanted to question him without counsel.

Supreme Court denied the motion to suppress.  Following a bench trial, defendant was convicted as stated above.  The People requested that defendant be adjudicated a persistent felony offender based upon prior first- and second-degree robbery

convictions.  Following a hearing, the court adjudicated
defendant a persistent felony offender and sentenced him to an
aggregate term of 15 years to life in prison.

The Appellate Division affirmed, with one Justice
dissenting (130 AD3d 644 [2d Dept 2015]).  That Court concluded
that defendant's warrantless arrest did not violate Payton (see
id. at 645).  The Appellate Division made factual findings that,
after entering the front door of the house, passing through a
vestibule and climbing the stairs, "[o]ne of the officers knocked
on the closed apartment door, the defendant opened it, and the
officer effectuated the arrest in the doorway.  The arresting
officer did not go inside the defendant's apartment, or reach in
to pull the defendant out" (id. [emphasis added]).  Most
critically here, the Appellate Division found that "defendant was
arrested at the threshold of his apartment after he voluntarily
emerged" (id. [internal quotation marks and citation omitted]).[2]
Thus, the Appellate Division concluded that defendant had
voluntarily "surrendered the enhanced constitutional protection
of the home" (id. [internal quotation marks and citation
omitted]).  The Appellate Division also upheld the persistent
felony offender adjudication.  The dissenting Justice diverged

_____

[2] In his dissent, Judge Wilson acknowledges that we are
bound by the Appellate Division's findings of facts, but takes
issue with our "interpretation of those findings" (Wilson, J.,
Dissent op, at 4).  Judge Wilson's lengthy "interpretation" of
the facts, however, conflicts with the findings of the Appellate
Division.

from the majority only with respect to the denial of defendant's motion to suppress, concluding that the People failed to establish that the initial police entry into the building where defendant lived was lawful because there was no evidence that the police knew the building was a two-family house, rather than a one-family house, prior to entering it (see id. at 646).

The dissenting Justice thereafter granted defendant leave to appeal.

II.

Defendant's primary argument is that his post-arrest statements and the physical evidence recovered from him at the precinct should have been suppressed because his warrantless arrest in the doorway of his apartment was unconstitutional under Payton. Specifically, he asserts that the arrest violated his constitutional right to be free from unreasonable searches and seizures because he opened his door only in response to knocking by police officers who were there for the sole purpose of arresting him without a warrant. Defendant's arguments are refuted by our precedent.

Although "[i]t is axiomatic that warrantless entries into a home to make an arrest are presumptively unreasonable" (People v McBride, 14 NY3d 440, 445 [2010] [internal quotation marks and citation omitted] [emphasis added]), we "have long recognized that the Fourth Amendment is not violated every time police enter a private premises without a warrant" (People v

Molnar, 98 NY2d 328, 331 [2002]).  There are "a number of 'carefully delineated' exceptions to the Fourth Amendment's Warrant Clause" in that context (Molnar, 98 NY2d at 331, quoting Welsh v Wisconsin, 466 US 740, 749-750 [1984]).  One of those exceptions is consent to entry (see id. at 331 n 1; People v Levan, 62 NY2d 139, 141 [1984]).  Similarly, we have repeatedly and consistently recognized that, even where "the police could have obtained an arrest warrant for [a] defendant from a neutral magistrate before it dispatched . . . members from its force to [the] defendant's home . . ., there [i]s nothing illegal about the police going to [a] defendant's apartment and requesting that he [or she] voluntarily come out" (McBride, 14 NY3d at 447; see People v Spencer, 29 NY3d 302, 312 [2017]; People v Reynoso, 2 NY3d 820, 821 [2004]; People v Minley, 68 NY2d 952, 953-954 [1986]).

The Supreme Court of the United States held in Payton itself that "the Fourth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest" (445 US at 576 [emphasis added]) despite "ample time to obtain a warrant" (id. at 583).  The Court explained that "the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant" (id. at 590).

As the Supreme Court has subsequently explained, Payton

does not prohibit the police from knocking on a suspect's door because, "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak" (Kentucky v King, 563 US 452, 469 [2011]). However, police may not compel a suspect to open a door by threatening to violate the Fourth Amendment by, "for example, . . . announcing that they would break down the door if the occupants did not open the door voluntarily" (id. at 471).[3] Nor does Payton prohibit a warrantless arrest in the doorway; indeed, "the warrant requirement makes sense only in terms of the entry, rather than the arrest [because] the arrest itself is no more threatening or humiliating than a street arrest" (3 Wayne R. LaFave, Search and Seizure § 6.1 [e] [5th ed. 2012] [internal quotation marks and citation omitted]).

Consistent with that understanding of Payton as prohibiting only "the police . . . crossing the threshold of a

---

[3] In Florida v Jardines, the Supreme Court further recognized that there is an "implicit license [that] typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave . . . Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do'" (569 US 1, 8 [2013], quoting Kentucky v King, 563 US 452, 469 [2011]; see People v Kozlowski, 69 NY2d 762-763 [1987]).

suspect's home to effect a warrantless arrest in the absence of exigent circumstances" (Minley, 68 NY2d at 953), we have upheld warrantless arrests -- both planned and unplanned -- of defendants who emerged from their homes after police knocked on an open door and requested that the defendant come out (see (Spencer, 29 NY3d at 312, revg on other grounds 135 AD3d 608 [1st Dept 2016]), used a noncoercive ruse to lure the defendant outside (see People v Roe, 73 NY2d 1004, 1005 [1989], affg 136 AD2d 140 [3d Dept 1988]), or directed the defendant to come out after seeing him peek through a window (see Minley, 68 NY2d at 953).  We also upheld a planned, warrantless arrest where the defendant either voluntarily exited his house, or stood behind his mother in the front doorway, and stuck his head out of the door in response to a police request that he come outside (see Reynoso, 2 NY3d at 821, affg 309 AD2d 769 [2d Dept 2003]).  In other words, for purposes of determining whether there was a Payton violation, we have deemed it to be irrelevant whether the defendant was actually standing outside his home or was standing "in the doorway," and we have upheld a threshold arrest, like that at issue here.[4]  Critically, the police never entered the

_____

    [4] Defendant argues that Reynoso is distinguishable because that case did not address instances in which police go to a suspect's residence with the subjective intent to make a warrantless arrest and lure the suspect to the doorstep for that purpose.  However, the facts in Reynoso demonstrate that the police did just that -- they used a ruse to get the defendant to the door, where the officers requested that he come outside and he either voluntarily exited the house or stood in the doorway

defendants' homes in these cases and, thus, the intrusion
prohibited by Payton did not occur.

                               III.

          Despite our jurisprudence on this issue, defendant and
two of our dissenting colleagues, Judges Wilson and Rivera, urge
us to adopt a new rule that warrantless "threshold/doorway
arrests" violate Payton when the only reason the arrestee is in
the doorway is that he or she was summoned there by police.
Defendant purports to find support for this rule in United States
v Allen (813 F3d 76 [2d Cir 2016]), which he urges us to adopt
and characterizes as holding that the police may not go to a
suspect's home and lure him or her to the doorstep for the sole
purpose of making a warrantless arrest.[5]  However, we are not
bound by Allen[6] and, in any event, it is distinguishable.  In

_____

(see 309 AD2d 769, 771 [2d Dept 2003] [McGinity, J. dissenting]).
Thus, we reject defendant's argument that there is any meaningful
distinction between Reynoso and this case.

     [5] Two of the dissenters would go further and hold that "if
the police plan to arrest someone who is at home, absent exigent
circumstances, until they have an arrest warrant, they may not go
to the person's door to arrest him or cause him to leave his home
to arrest him outside of it" (Wilson, J., Dissent Op., at 7), and
that an "arrest is constitutionally invalid" when "the sole
reason the police went to defendant's home was to effect his
arrest . . . without a warrant" (Rivera, J., Dissent Op., at 12).
As explained below, a rule turning on subjective police intent is
"fundamentally inconsistent with . . . Fourth Amendment
jurisprudence" (Kentucky v King, 563 US 452, 469 [2011]).

     [6] To the extent Judge Wilson suggests that we should adopt
Allen to "ensur[e] our protections are no less than those
guaranteed by the local federal courts" (Wilson, J., Dissent Op

that case, police went to the defendant's apartment with the plan of arresting him (see id. at 78). After they knocked on the defendant's door, he stepped out onto his second floor porch and police requested that he come down to speak with them (see id. at 79). The defendant complied and, after speaking to the officers for several minutes, they told him that he would have to come down to the police station to be processed for an alleged assault -- i.e., that he was under arrest (see id.). The Second Circuit noted that "neither party dispute[d] that [the defendant] was arrested while he was still inside his home" or that the defendant "was arrested while standing inside the threshold of his home" (see id. at 80 n 6). Thus, "th[e] case concern[ed] an 'across the threshold' arrest" (id.) -- i.e., while the police remained outside on the sidewalk (see id. at 79), the defendant "was arrested specifically 'in' his home rather than 'on' the threshold or in 'a public place'" (id. at 89 [Lohier, J., concurring]). After the defendant was arrested, police accompanied him upstairs in his home so that he could retrieve a pair of shoes; once inside, the officers saw, among other things, drug paraphernalia and obtained a search warrant (see id. at 79).

---

at 6, n 4), we emphasize that, while "the interpretation of a Federal constitutional question by the lower Federal courts may serve as useful and persuasive authority for our Court, [it is] not binding [on] us" (People v Kin Kan, 78 NY2d 54, 59 [1991]; see People v Pignataro, 22 NY3d 381, 386 n 3 [2013]). In other words, we do not abandon our jurisprudence in response to every new lower federal court decision.

The Second Circuit held that, "where law enforcement officers have summoned a suspect to the door of his home, <u>and he remains inside the home's confines</u>, they may not effect a warrantless 'across the threshold' arrest in the absence of exigent circumstances" (<u>id.</u> at 82 [emphasis added]). That is, "[a] police officer not armed with a warrant may approach a home and knock," but "may [not] go to a person's home . . . and then arrest him <u>while he remains in his home</u>" (<u>id.</u> at 84 [emphasis added]). Although the Second Circuit recognized that a federal "circuit split" exists on the issue, with some courts holding that police do not violate <u>Payton</u> unless they enter the home, that court reasoned that <u>Payton</u> turns on the arrested person's location, not the location or conduct of the officers (<u>see</u> <u>id.</u> at 78, 81-82, 85).[7]

_____

[7] The Second Circuit further declined to adopt the rationale of other federal Circuit Courts that do <u>not</u> require police entry into a home to invalidate an arrest, rejecting what it deemed "the legal fiction of constructive or coercive entry, a doctrine under which certain types of police conduct will be deemed an entry" (<u>United States v Allen</u>, 813 F3d 76, 81 [2d Cir 2016]; <u>see e.g.</u> <u>United States v Reeves</u>, 524 F3d 1161, 1165 [10th Cir 2008] [holding that defendant opened his door and stepped out of motel room in response to coercive police conduct after officers made phone calls to the room, knocked on the door and window with flashlights, and loudly identified themselves as police officers over the course of 20 minutes]). As recognized by the Second Circuit, that doctrine applies only if a police "command to the occupant to submit to arrest is sufficiently forceful and compelling" (<u>Allen</u>, 813 F3d at 88). Here, no such command was given before defendant voluntarily entered the threshold of his apartment door -- there was simply a knock on the door. Moreover, defendant does not ask us to apply the constructive entry rule in this case.

Here, the issues of where defendant was standing at the time of his arrest and whether he was in that location voluntarily are mixed questions of law and fact (see Spencer, 29 NY3d at 312). We are, therefore, bound by the Appellate Division's finding that defendant was arrested "in the doorway" after he "voluntarily emerged," for which there is record support (130 AD3d at 645; see People v Bradford, 15 NY3d 329 [2010]). Thus, Allen, which applies to "'across the threshold' arrests" (813 F3d at 81, 85, 87, 88), is distinguishable and does not apply here.

                              IV.

Defendant further claims that this case is ultimately about closing a loophole to our decision in People v Harris, in which "we h[e]ld that our State Constitution requires that statements obtained from an accused following a Payton violation must be suppressed unless the taint resulting from the violation has been attenuated" (77 NY2d 434, 437 [1991]). We explained that, "[u]nder both Federal and State law, the right to counsel attaches once criminal proceedings have commenced" (id. at 439). However, while "[u]nder the [f]ederal rule, . . . criminal proceedings do not necessarily start when an arrest warrant is issued . . ., criminal proceedings must be instituted before the police can obtain a warrant" in New York (id. at 439-440). Thus, in New York, "police are prohibited from questioning a suspect after an arrest pursuant to a warrant unless counsel is present,"

creating an incentive "to violate Payton . . . because doing so enables them to circumvent the accused's indelible right to counsel" (id. at 440).  Defendant, as well as Judges Rivera and Wilson in their respective dissents, focus on the intent of the police in going to a defendant's home and urge that sanctioning preplanned doorway arrests -- or, presumably, arrests where the police request that the defendant step outside to speak to them with the intent of effectuating a preplanned arrest -- similarly permits police to circumvent a suspect's right to counsel.  Thus, defendant contends, and the two dissenters on this issue agree, that we should prohibit arrests where the police lure a suspect to the door with the subjective intent of making a preplanned, warrantless arrest.

Inasmuch as Harris applies only to statements obtained following a Payton violation, suppressing defendant's statements here would require us to overrule our prior cases holding that preplanned, warrantless arrests do not violate Payton where the defendant exited his residence or stood on the threshold either due to a police request or to a ruse employed by the police.[8]  We

_____

[8] In addition to advocating that we overrule our prior cases, Judge Wilson views those cases as irrelevant because they concern only the application of Payton and the Fourth Amendment and do not address whether greater protection is warranted under the State Constitution.  Any issues regarding whether New York Constitution article I, § 12 provides greater protection or "should . . . provide[] greater clarity" (Wilson, J., Dissent Op, at 7) are unpreserved here because, in the suppression hearing, defendant did not argue that the state constitution provides greater protections than its federal counterpart to defendants

decline to do so based upon the principle of stare decisis, "the doctrine which holds that common-law decisions should stand as precedents for guidance in cases arising in the future and that a rule of law once decided by a court, will generally be followed in subsequent cases presenting the same legal problem" (People v Peque, 22 NY3d 168, 194 [2013], cert denied 135 S Ct 90 [2014] [internal quotation marks and citations omitted]).  Stare decisis "rests upon the principle that a court is an institution, not merely a collection of individuals, and that governing rules of law do not change merely because the personnel of the court changes" (People v Bing, 76 NY2d 331, 338 [1990]), as well as the "humbling assumption, often true, that no particular court as it is then constituted possesses a wisdom surpassing that of its predecessors" (People v Hobson, 39 NY2d 479, 488 [1976]).

While we apply the doctrine less rigidly in resolving constitutional issues (see Bing, 76 NY2d at 338), "[e]ven under the most flexible version of the doctrine applicable to constitutional jurisprudence, prior decisions should not be overruled unless a 'compelling justification' exists for such a drastic step" (Matter of State Farm Mut. Auto. Ins. Co. v Fitzgerald, 25 NY3d 799, 819 [2015]).  We have found such "compelling justification[s]" when a prior decision has led "to an unworkable rule, or ... create[d] more questions than it

_____

subject to warrantless arrests in the home.  Therefore, we do not opine on the merits of such an argument.

resolves; adherence to a recent precedent involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience; or a preexisting rule, once thought defensible, no longer serves the ends of justice or withstands the cold light of logic and experience" (Peque, 22 NY3d at 194 [internal quotation marks and citations]).  None of those justifications exist here; nor are we persuaded that the "lessons of experience and the force of better reasoning" (Bing, 76 NY2d at 338 [internal quotation marks and citation omitted]) compel us to abandon our line of prior decisions on the issue that is now before us yet again.

Far from being unworkable, as the Appellate Division noted in this case, the current rule "is clear and easily understood: a person enjoys enhanced constitutional protection from a warrantless arrest in the interior of the home, but not on the threshold itself or the exterior" (130 AD3d at 645). Moreover, we are not asked to overrule a recent precedent that conflicts with a broader, pre-existing doctrine, but to adopt a rule that looks to the subjective intent of the police and is, therefore, "fundamentally inconsistent with . . . Fourth Amendment jurisprudence" itself (Kentucky v King, 563 US at 464 [internal quotation marks and citation omitted]).  Both this Court and the Supreme Court have "rejected a subjective approach, asking only whether the circumstances, viewed objectively, justify the action" (id.; see People v Robinson, 97 NY2d 341, 349

[2007]).  As both Courts have explained, "'[t]he touchstone of the Fourth Amendment is reasonableness' -- not the warrant requirement" (see Molnar, 98 NY2d at 331, quoting United States v Knights, 534 US 112, 118 [2001]).  Therefore, this Court has emphasized that "the 'Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, whatever the subjective intent'" (People v Robinson, 97 NY2d at 349, quoting Whren v United States, 517 US 806, 814 [2001] [emphasis added]).  Based on long experience, we "acknowledge[d] the difficulty, if not futility, of basing the constitutional validity of searches or seizures on judicial determinations of the subjective motivation of police officers" (id. at 350 [internal quotation marks and citation omitted]).  Thus, under the circumstances presented here, it is not our prior precedent that "involves collision with a prior doctrine more embracing in its scope" (Peque, 22 NY3d at 194), but the rule proposed by defendant, as well as the even broader rule proposed by Judges Wilson and Rivera in dissent.

        With respect to the effect of the current rule on our own jurisprudence, it certainly cannot be said that "the Judges considering these cases [have been] sharply divided . . . about how to apply the . . . rule [or] about the more fundamental question of whether the facts presented are even encompassed within it" (Bing, 76 NY2d at 348).  Rather, all of our prior cases addressing the issue over the last 30 years -- from Minley

to Spencer -- have been unanimous and posed little difficulty.
Moreover, Spencer, decided just a few months ago, reaffirmed both
Reynoso and Minley.  Overturning those cases now would both
undermine the purposes of stare decisis -- which are "to promote
efficiency and provide guidance and consistency in future cases"
(Bing, 76 NY2d at 338) -- and "unsettle the belief 'that bedrock
principles are founded in the law rather than in the proclivities
of individuals'" (id. at 361, quoting Vasquez v Hillery, 474 US
254, 265 [1986] [Kaye, J. concurring in part and dissenting in
part]).  Furthermore, the various rules urged by defendant and
Judges Wilson and Rivera would throw into confusion a "'bright
line rule[]'" that has long "'guide[d] the decisions of law
enforcement and judicial personnel who must understand and
implement our decisions in their day-to-day operations in the
field'" (People v Garcia, 20 NY3d 317, 323 [2012], quoting People
v P.J. Video, 68 NY2d 296, 305 [1986], cert denied 479 US 1091
[1987]).

         As for the cold light of logic and experience,
"[p]ermitting the police to make a warrantless arrest of a person
who answers the door (or who is properly summoned to the door
. . .)" has been described as "mak[ing] great sense" (3 Wayne R.
LaFave, Search and Seizure § 6.1[e] [5th ed. 2012]).  Under that
rule, to which we have consistently adhered,

             "the police are quite properly relieved from
             having to obtain arrest warrants in a large
             number of cases in advance, and the warrant
             process is thereby not overtaxed (thus giving

greater assurance it will not become a
mechanical routine). But if in a particular
case in which there were no exigent
circumstances to start with the intended
arrestee at the door elects to exercise the
security of the premises by not submitting to
the arrest, then it is hardly unfair that the
police should be required to withdraw and
return another time with a warrant"

(id.). In contrast, the Supreme Court has rejected the approach

advanced by defendant -- and that forms the basis of the

reasoning of two of the dissenters (see Wilson, J., Dissent op.,

at 14-17; Rivera, J., Dissent Op at 18-19) -- that "fault[s] law

enforcement officers if, after acquiring evidence that is

sufficient to establish probable cause to search particular

premises, the officers do not seek a warrant but instead knock on

the door and seek . . . to speak with an occupant" (Kentucky v

King, 563 US at 466). The Court explained that such an approach

"unjustifiably interferes with legitimate law enforcement

strategies" (id.).[9]

In short, there is no compelling justification to

overrule our prior cases in order to expand Harris by recognizing

a new category of Payton violations based on subjective police

---

[9] In contrast to Judge Wilson's unsupported assumptions
about the "relative ease of securing an arrest warrant" (Wilson,
J., Dissent Op, at 17), the Supreme Court observed that "the
police may want to ask an occupant of the premises for consent to
search because doing so is simpler, faster, and less burdensome
than applying for a warrant" and that such a reason is "entirely
proper" (Kentucky v King, 563 US at 466-467). In any event,
there may be many legitimate reasons why it would be impractical
in a particular situation to obtain a warrant or wait for a
defendant to exit the home.

intent.  Rather, overruling our prior cases would present an unacceptable obstruction to law enforcement, eliminate a clear and workable rule that has guided the courts for decades, undermine predictability in the law and reliance upon our decisions, and suggest that "our decisions arise [not] from a continuum of legal principle[,] [but] the personal caprice of the members of this Court" (Peque, 22 NY3d at 194).  Such a result is untenable.

V.

Defendant's remaining arguments do not require extended discussion.  His additional challenges to the legality of his arrest and the lack of attenuation of his subsequent statements from that arrest are either unpreserved, academic or unreviewable pursuant to the LaFontaine/Concepcion rule, which precludes us "from reviewing an issue that was either decided in an appellant's favor or was not decided by the trial court" (People v Ingram, 18 NY3d 948, 949 [2012]; see People v Concepcion, 17 NY3d 192 [2011]; People v LaFontaine, 92 NY2d 470 [1998]).[10]  His

---

[10] With respect to the issue of defendant's reasonable expectation of privacy addressed by Judge Rivera in her dissent, in People v Hansen, 99 NY2d 339, 346 n 6 [2003], affg 290 AD2d 47 [2002]), this Court recognized that a "distinction" can exist "between the two residences -- a single-family house and a two-family house -- impacting the constitutional analysis" (Rivera, J., Dissent op., at 6).  Therefore, the burden was on defendant to establish a reasonable expectation of privacy in the shared area of the two-family house (see e.g. People v Leach, 21 NY3d 969 [2013]).  Defendant, however, not only made no specific offer of proof, but also failed to make any arguments in this regard and, thus, the issue is not preserved for our review (see CPL

claim that his statement to police was involuntary presents a mixed question, and there is record support for the conclusion of the Appellate Division to the contrary.  Finally, defendant's challenge to his persistent felony offender adjudication is governed by our decision in People v Prindle (29 NY3d 463 [2017]), which requires an affirmance here.  Contrary to defendant's contentions, neither Hurst v Florida (___ US ___, 136 S Ct 616 [2016]) nor Descamps v United States (___ US ___, 133 S Ct 2276 [2013]) compels a different result.  Nor have any new reasons been presented that would otherwise require us to retreat from an interpretation that we reaffirmed as recently as Prindle.

Accordingly, the order of the Appellate Division should be affirmed.

470.05 [2]).

People v Sean Garvin

No. 82

FAHEY, J. (dissenting in part):

I would vacate defendant's sentence and remit to Supreme Court for resentencing. New York's persistent felony offender sentencing scheme is unconstitutional under Apprendi v New Jersey (530 US 466 [2000]). I disagree with this Court's line of cases from People v Rosen (96 NY2d 329 [2001]) to People v Prindle (29 NY3d 463 [2017]), holding that the statutory sentencing scheme lies "outside the scope of the Apprendi rule, because it exposes defendants to an enhanced sentencing range based only on the existence of two prior felony convictions" (Prindle, 29 NY3d at 466). However, I agree with the majority's analysis of the Payton issue in this case and with the Court's disposition of defendant's remaining arguments. Consequently, I dissent, but only in part.

I.

A persistent felony offender is, by definition, an individual, "other than a persistent violent felony offender as defined in [Penal Law] section 70.08, who stands convicted of a felony after having previously been convicted of two or more felonies," specifically defined (Penal Law § 70.10 [1] [a]). Being a "persistent felony offender" is, however, only one of two

- 1 -

necessary conditions for the imposition of an enhanced sentence under the pertinent sentencing statute, Penal Law § 70.10.  The other necessary condition is that the sentencing court must be of the reasoned opinion, as set out in the sentencing record, "that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest" (Penal Law § 70.10 [2]).  If the first necessary condition is met, but not the second, a persistent felony offender may not be given enhanced sentencing.

The Criminal Procedure Law confirms that both conditions are necessary, and that neither is on its own sufficient.  Persistent felony offender enhanced sentencing "may not be imposed unless . . . the court (a) has found that the defendant is a persistent felony offender as defined in subdivision one of section 70.10 of the penal law, and (b) is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct are such that extended incarceration and lifetime supervision of the defendant are warranted to best serve the public interest" (CPL 400.20 [1] [b] [emphases added]).

On the second prong, the sentencing court, in order to reach the "opinion" that enhanced sentencing is warranted, "must . . . make such findings of fact as it deems relevant" (CPL 400.20 [9] [emphasis added]).  Moreover, a record of the basis

for the sentencing court's findings must be set forth (see CPL
400.20 [3] [b]).

The two necessary conditions have differing standards
of proof.  "A finding that the defendant is a persistent felony
offender, as defined in [Penal Law § 70.10 (1)], must be based
upon proof beyond a reasonable doubt by evidence admissible under
the rules applicable to the trial of the issue of guilt," whereas
"[m]atters pertaining to the defendant's history and character
and the nature and circumstances of his criminal conduct may be
established by any relevant evidence, not legally privileged,
regardless of admissibility under the exclusionary rules of
evidence, and the standard of proof with respect to such matters
shall be a preponderance of the evidence" (CPL 400.20 [5]).

II.

The United States Supreme Court held in Apprendi v New
Jersey (530 US 466) and its progeny that, under the Due Process
Clause of the Fourteenth Amendment and the right to a jury trial
guaranteed by the Sixth Amendment, a jury must determine each
element of a crime beyond a reasonable doubt, including any fact
that has the effect of increasing the prescribed range of
penalties to which a defendant is exposed at sentencing (see
Apprendi, 530 US at 489-490; see also Alleyne v United States,
133 S Ct 2151, 2155 [2013] ["Any fact that, by law, increases the
penalty for a crime is an 'element' that must be submitted to the
jury and found beyond a reasonable doubt"]).  One exception is a

fact admitted by the defendant (see Blakely v Washington, 542 US 296, 303 [2004]), and the other is the established fact of a prior felony conviction (see Almendarez-Torres v United States, 523 US 224 [1998]).

At issue in Apprendi was a hate crime sentencing scheme that allowed a judge to increase a defendant's penalty beyond the maximum sentence range authorized for a particular crime, based on the judge's finding by a preponderance of the evidence that defendant committed a crime with the intent to intimidate based on race, religion, color, gender, ethnicity, sexual orientation, or handicap. Apprendi ruled that a jury, not a judge, must find, beyond a reasonable doubt, that a defendant acted with such a biased purpose, in order for the sentencing enhancement to be imposed. The hate crime statute violated the Constitution because it required a judge to find an element that would increase the defendant's sentence, instead of submitting that question of fact to the jury, and it allowed the judge to decide the fact using a lesser standard of proof.

In subsequent years, the Apprendi doctrine has been applied "to instances involving plea bargains, sentencing guidelines, criminal fines, mandatory minimums, and . . . capital punishment" (Hurst v Florida, 136 S Ct 616, 621 [2016], citing Blakely v Washington, 542 US 296; United States v Booker, 543 US 220 [2005]; S. Union Co. v United States, 132 S Ct 2344 [2012]; Alleyne, 133 S Ct 2151; Ring v Arizona, 536 US 584 [2002]).

This Court first considered the import of <u>Apprendi</u> in <u>People v Rosen</u> (96 NY2d 329), in which the defendant contended that the persistent felony offender sentencing provisions of Penal Law § 70.10 and CPL 400.20 (5) violated his right to trial by jury under <u>Apprendi</u>.  This Court analyzed the statutes as follows:

> "Under New York law, to be sentenced as a persistent felony offender, the court must first conclude that defendant had previously been convicted of two or more felonies for which a sentence of over one year was imposed.  Only after it has been established that defendant is a twice prior convicted felon may the sentencing court, based on the preponderance of the evidence, review 'matters pertaining to the defendant's history and character and the nature and circumstances of his criminal conduct . . . established by any relevant evidence, not legally privileged' to determine whether actually to issue an enhanced sentence (CPL 400.20 [5]).  It is clear from the foregoing statutory framework that the prior felony convictions are the sole [determinant] of whether a defendant is subject to enhanced sentencing as a persistent felony offender." (<u>Rosen</u>, 96 NY2d at 334-335).

This analysis was fundamentally flawed.  It is true, of course, that under Penal Law § 70.10, for a defendant to be sentenced as a persistent felony offender, the court must first conclude that defendant had previously been convicted of two or more felonies for which a sentence of over one year had been imposed.  That is the first necessary condition of persistent felony offender enhanced sentencing.  It is also true that the sentencing court would only review the defendant's history and

character and the nature and circumstances of his or her criminal conduct after concluding that the first condition had been met. However, it was a complete non sequitur to conclude from these propositions that prior felony convictions are the sole determinant of whether a defendant is subject to persistent felony offender enhanced sentencing.

The statute is clear that a defendant is subject to enhanced sentencing -- i.e., may have enhanced sentencing imposed on him -- as a persistent felony offender only if both statutory necessary conditions are met. Only "[w]hen the court has found . . . that a person is a persistent felony offender, and . . . it is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest," may the court impose the enhanced sentence (Penal § 70.10 [2] [emphasis added]).

The Rosen Court, after thus misreading the statutory language, added that the sentencing court, in deciding whether extended incarceration and life-time supervision will best serve the public interest, is "only fulfilling its traditional role . . . in determining an appropriate sentence within the permissible statutory range" (Rosen, 96 NY2d at 335). This analysis, clearly designed to suggest that the second necessary condition of persistent felony offender enhanced sentencing is purely discretionary, rather than a fact-finding exercise,

misstated the sentencing court's task.  Deciding whether "the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest" (Penal § 70.10 [2]) is deciding a question that has one of only two answers: yes, the public interest is best served by extended incarceration and life-time supervision, or no, it is not.  It is not an exercise in determining a sentence within a range.  That comes later, when the sentencing court actually imposes the sentence.  Moreover, as the statutes themselves clarify, the Penal § 70.10 (2) determination involves making "findings of fact" (CPL 400.20 [9]).

In People v Rivera (5 NY3d 61 [2005]), the defendant -- one of many to do so -- asked the Court to overturn Rosen.  The Court declined.  While properly analyzing the question to be "whether any facts beyond those essential to the jury's verdict (other than prior convictions or admissions) were necessary for the trial judge to impose the persistent felony offender sentence" (Rivera, 5 NY3d at 65-66), the Court reiterated its earlier flawed conclusion that a defendant's prior convictions constitute the sole determinant for whether he or she is subject to persistent felony offender sentencing, suggesting that Penal Law § 70.10 "authorizes" sentencing as a persistent felony offender "once the court finds persistent felony offender status" (id. at 66).  Rivera ignored the clear statutory language making

the Penal Law § 70.10 (2) determination a necessary condition of the imposition of persistent felony offender sentencing.

Contrary to Rivera, the mere existence of the prior felonies is not a "sufficient condition[] for imposition of the authorized sentence for recidivism" (Rivera, 5 NY3d at 68; see also Prindle, 29 NY3d at 467), but only a necessary condition. As Chief Judge Kaye observed in her dissent,

> "[f]itting the definition of a persistent felony offender under Penal Law § 70.10 (1) is necessary but not sufficient to render a defendant eligible for enhanced sentencing under CPL 400.20. Rather, an enhanced sentence is available only for those who additionally are found to be of such history and character, and to have committed their criminal conduct under such circumstances, that extended incarceration and lifetime supervision will best serve the public interest. The persistent felony offender statute thus stands in stark contrast to Penal Law § 70.08, which requires that all three-time violent felons be sentenced to an indeterminate life term on the basis of the prior convictions alone" (Rivera, 5 NY3d at 73 [Kaye, C.J., dissenting] [citation omitted]).

Other Judges of this Court have dissented in persistent felony offender sentencing cases for the same reason, among others (see Rivera, 5 NY3d at 79-80 [Ciparick, J., dissenting]; People v Battles, 16 NY3d 54, 63-65 [2010] [Lippman, C.J., dissenting in part]; People v Giles, 24 NY3d 1066, 1073-1074 [2014] [Abdus-Salaam, J., dissenting]). As Judge Ciparick noted, review of related statutes confirms Chief Judge Kaye's insight. "Had the Legislature intended for the inquiry to end at

recidivism, it could, for example, have replicated the language of Penal Law § 70.08, which mandates sentencing for persistent violent felony offenders based solely on recidivism, or it could have used the [similar] language of Penal Law § 70.04 or § 70.06 as it relates to second felony offenders and second violent felony offenders" (Rivera, 5 NY3d at 80 [Ciparick, J., dissenting]).

## III.

The Rivera Court further erred by holding that a sentencing court's Penal Law § 70.10 (2) determination -- that the defendant's character and criminality indicate that the public interest is best served by extended incarceration and life-time supervision -- "describes the exercise of judicial discretion characteristic of indeterminate sentencing schemes" (id. at 66) and "falls squarely within the most traditional discretionary sentencing role of the judge" (id. at 69).  As the Court put it, "[o]nce the defendant is adjudicated a persistent felony offender, the requirement that the sentencing justice reach an opinion as to the defendant's history and character is merely another way of saying that the court should exercise its discretion" (id. at 71).

This was an attempt to give an alternate source of support for the Rosen Court's notion that a sentencing court's determination that enhanced sentencing would serve the public interest was simply a matter of the sentencing court's

"fulfilling its traditional role" (Rosen, 96 NY2d at 335).  In a footnote, the Rivera Court suggested that judicial findings prohibited by Apprendi "relate to the crime for which the defendant was on trial and, as quintessential fact questions, would properly have been subject to proof before the jury, in stark contrast to traditional sentencing analysis of factors like the defendant's difficult childhood, remorse or self-perceived economic dependence on a life of crime" (Rivera, 5 NY3d at 69 n 8).

Rivera, however, was inconsistent with Apprendi and its progeny.  The exercise of determining whether enhanced sentencing would serve the public interest may involve the application of the sentencing judge's discretion, but it is no less factual for being, in the end, discretionary in nature.  In order to exercise discretion on the subject of whether enhanced sentencing would serve the public interest, the sentencing court must first make findings concerning "the facts surrounding defendant's history and character" (Rivera, 5 NY3d at 67), or, as the Criminal Procedure Law puts it, "must . . . make such findings of fact as it deems relevant" (CPL 400.20 [9]).  Furthermore, as Chief Judge Kaye noted in her dissent in Rivera, the Supreme Court has made it "clear that any factfinding essential to sentence enhancement must be decided by a jury, even if it is general and unspecified in nature, and even if the ultimate sentencing determination is discretionary" (Rivera, 5 NY3d at 73-74 [Kaye, C.J., dissenting]

[footnote omitted]).

The Supreme Court had clarified that point in Blakely v Washington (542 US 296) [holding that Apprendi was violated where the sentencing court had to find that defendant acted with "deliberate cruelty" in order to impose enhanced sentencing]). In Blakely, the Supreme Court observed that "[w]hether the judge's authority to impose an enhanced sentence depends on finding a specified fact . . ., one of several specified facts . . ., or any aggravating fact . . ., it remains the case that the jury's verdict alone does not authorize the sentence.  The judge acquires that authority only upon finding some additional fact" (Blakely, 542 US at 305).  Moreover, the Supreme Court explained, it does not "matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure.  He [or she] cannot make that judgment without finding some facts to support it beyond the bare elements of the offense.  Whether the judicially determined facts require a sentence enhancement or merely allow it, the verdict alone does not authorize the sentence" (Blakely, 542 US at 305 n 8).  In other words, "broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in any particular case, does not shield a sentencing system from [Apprendi].  If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment

requirement is not satisfied" (Cunningham v California, 549 US 270, 290 [2007]).

Rivera, like Rosen before it, was not correctly decided, because the findings contemplated by Penal Law § 70.10 (2) involve facts that have the effect of increasing the prescribed range of penalties to which a defendant is exposed at sentencing, within the meaning of Apprendi.  In sum, it is clear that a sentencing court, in deciding "that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest" (Penal Law § 70.10 [2]), is necessarily making factual findings that must instead be made by the jury, under Apprendi.

## IV.

"The constitutionality of sentences imposed under this sentencing scheme has, not surprisingly, been a practically constant subject of litigation since Apprendi" (Battles, 16 NY3d at 61 [Lippman, C.J., dissenting in part]).  In the years since Rosen and Rivera, this Court has reiterated the misguided analysis provided in those opinions: that the first prong of Penal Law § 70.10 is the sole determinant of persistent felony offender sentencing, and that "New York's sentencing scheme, by requiring that sentencing courts consider defendant's 'history and character' and the 'nature and circumstances' of defendant's conduct in deciding where, within a range, to impose an enhanced

sentence, sets the parameters for the performance of one of the sentencing court's most traditional and basic functions, i.e., the exercise of sentencing discretion" (People v Quinones, 12 NY3d 116, 130 [2009]; see also Prindle, 29 NY3d at 466-467).

The foregoing discussion of the statutes, however, demonstrates that Penal Law § 70.10 (2) is a separate necessary condition, and does not simply allow a sentencing court to "decid[e] where, within a range, to impose an enhanced sentence" (Quinones, 12 NY3d at 130); rather, it requires that a sentencing court decide whether the factual circumstances of defendant's crimes and character warrant enhanced sentencing, before imposition of any enhanced sentence is permissible.

As my colleague Judge Abdus-Salaam wrote, a "recitation of the statutory terms suffices to show that . . . the persistent felony offender sentencing scheme violates the Apprendi rule," and the Court's "Apprendi precedents have devolved into hollow and discredited words supporting a clearly unconstitutional sentencing framework" (Giles, 24 NY3d at 1074, 1076 [Abdus-Salaam, J., dissenting]).

V.

I do not quarrel with the majority's statement that the resolution of the Apprendi issue here "is governed by" our precedents (majority op at 16), but I believe there is "compelling justification for" overruling our prior holdings in this area, because they "create[] more questions than [they]

resolve[]" and "no longer serve[] the ends of justice or withstand[] the cold light of logic and experience" (People v Peque, 22 NY3d 168, 194 [2013] [internal quotation marks and citations omitted]).

I add a final comment on their larger significance and "real effect" (Battles, 16 NY3d at 65 [Lippman, C.J., dissenting in part]) in our system of justice. Exposing defendants to criminal penalties more severe than could be imposed based upon the jury verdict and prior convictions alone, without a jury making the factual determinations necessary for the enhancement in punishment, is abhorrent not only to the Federal Constitution but also to basic justice. For example, under Penal Law § 70.10, a non-violent serial shoplifter convicted of criminal possession of stolen property in the fourth degree, a class E felony for which the maximum sentence is four years' imprisonment (see Penal Law § 70.00 [2] [e]), may be given "the sentence of imprisonment authorized by [Penal Law § 70.00] for a class A-I felony" (Penal Law § 70.10 [2]), which is a minimum sentence of 15 years to life (see Penal Law § 70.00 [3] [a] [i]; see People v Ellison, 124 AD3d 1230 [4th Dept 2015], lv denied 25 NY3d 1201 [2015], vacated and motion for writ of error coram nobis granted, 136 AD3d 1354 [2016] [granting motion in light of defense counsel's failure to challenge finding that defendant is a persistent felony offender]). Applying the Court's interpretation of the statutory sentencing scheme allows a judge, without jury factfinding on the

factual circumstances of defendant's history and character, to punish such a shoplifter with the penalty associated with violent crimes such as kidnapping in the first degree (Penal Law § 135.25), aggravated murder (Penal Law § 125.26), or murder in the first or second degree (Penal Law §§ 125.27; 125.25). Silence in the face of such injustice would amount to acquiescence. Accordingly, I dissent.

People v Sean Garvin

No. 82

RIVERA, J.(dissenting):

The Fourth Amendment and our State Constitution provide "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" (US Const, 4th Amend; NY Const, art I, § 12; Payton v New York, 445 US 573, 576 [1980]). These constitutional protections afforded individuals reflect the societal recognition of the home as "the sacred retreat to which families repair for their privacy and their daily way of living" (Gregory v City of Chicago, 394 US 111, 125 [1969] [Black, J. concurring]). Hence, a warrantless entry by police to effectuate a home arrest, the most intrusive of government invasions into a person's privacy, is "presumptively unreasonable" (Payton v New York, 445 US 573, 586 [1980]). The People bear "the burden of overcoming that presumption" (People v Hodge, 44 NY2d 553, 557 [1978]), and thus "defendant has no burden to show he had an 'expectation of privacy' in his apartment" (People v Levan, 62 NY2d 139, 144 [1984]).

The People did not rebut that presumption here because they failed to establish, as a constitutional matter, that defendant lacked any reasonable expectation of privacy in the

- 1 -

location of the house where he was arrested, and that the arrest comes within one of the "carefully delineated" narrow exceptions to the warrant requirement (People v Molnar, 98 NY2d 328, 331 [2002], citing Welsh v Wisconsin, 466 US 740, 749-750 [1984]). This is enough, in my opinion, to find the police violated defendant's rights. However, the unreasonable intrusions that mark this case are not limited to a single constitutional violation caused by entering the commonly-shared areas of a two-family house. The People also failed to justify the police visit to defendant's home for the sole purpose of making a warrantless arrest, as this action undermined defendant's constitutionally protected indelible right to counsel (NY Const, art I, § 6; People v Lopez, 16 NY3d 375, 377 [2011]). Therefore, unlike the majority, I conclude that defendant's post-arrest statements were obtained in violation of his rights, and I dissent.

I.

A.

After establishing probable cause for defendant's arrest, the police proceeded without a warrant to his home to make the arrest. Within minutes of arriving at the home, the police made two uninvited and unannounced entries through the front door of the two-family house where defendant lived. Both times they walked through the vestibule immediately behind the front door and proceeded up the stairs that lead to defendant's

second-floor apartment.  At the top of the stairs the police

knocked and spoke briefly to the person who opened the door.  On

the second trip through defendant's house and back up the stairs,

the police again knocked on defendant's apartment door, and this

time, when defendant opened the door and while standing in the

doorway, the police told him he was under arrest.

The People incorrectly argue that defendant has

absolutely no privacy expectation in the area between the front

door of the house and the door leading directly to his living

space because his privacy interests only attach on the apartment

side of the upstairs door threshold.  In support of this claim,

the People rely on evidence at the suppression hearing that

established that defendant lived in a second floor apartment of a

two-family house.  That alone, however, is insufficient to meet

the People's heavy burden.[1]  The constitutional inquiry centers

on whether it was reasonable for defendant to assume that the

---

[1] The majority recognizes that a resident of a two-family
house may have a privacy interest in a common area, yet suggests
that we have previously decided that the burden of establishing
this interest always shifts to defendant.  The citation to People
v Leach (21 NY3d 969 [2013]), however, betrays the infirmity of
this position.  In that case, defendant resided in his
grandmother's apartment, and there was record support that his
grandmother did not want defendant to have unfettered access to
all areas of the apartment, including a guest room used solely by
other grandchildren in which a weapon was found (id. at 971-972).
This suggests nothing about an individual's expectation of
privacy inside the shared, enclosed hallway of their two-family
home -- defendant here does not claim to have a reasonable
expectation of privacy in his downstairs neighbor's living
quarters.

vestibule and stairway inside his house are private areas, which the police may not enter without consent or some other lawful basis (Levan, 62 NY2d at 141).

It is a basic principle of article I, section 12 of the New York Constitution and the Fourth Amendment to the United States Constitution that warrantless searches and seizures inside a home are presumptively unreasonable (People v Knapp, 52 NY2d 689, 694 [1981]; Brigham City, Utah v Stuart, 547 US 398, 403 [2006]).  This holds true even in a two-family house where the residents share common areas.  The United States Supreme Court has made clear that an individual can have a reasonable expectation of privacy in an area despite not having its exclusive use (Mancusi v DeForte, 392 US 364, 368 [1968]).  Further, the United States Supreme Court long ago rejected the notion that a defendant has no privacy expectations simply because a space may be accessible to the public since what a defendant "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected" (Katz v United States, 389 U.S. 347, 351 [1967]).  Thus, the fact that defendant lived in the second floor apartment of a two-family house does not automatically strip him of the constitutional protections afforded to the residents of the house in areas that they share in common.  The concept of the house as a home would be meaningless if it could be so easily compartmentalized into publicly unprotected spheres.

Even under the majority's analysis that the current law establishes a bright-line rule that the police may not cross the house threshold to make a warrantless arrest (maj op at 6), I cannot agree that the threshold is yards beyond the front door of the house and up a flight of stairs. Whether it is reasonable to view this area as holding some modicum of privacy depends on the relationship between the individual and the space (Katz, 389 US at 351). Residents would not imagine that simply by living in a two-family house, they effectively forfeit their privacy to all areas except for that space which is not commonly shared by the residents of the house or invited guests. Nor would they believe that they have exited their "sacred retreat" and the sanctuary of their home by stepping into an area with limited access to outsiders. Human experience leads to the conclusion that a resident of an upstairs living area in a two-family house has a privacy interest effective at the door leading into the building. The purpose of a front door to someone's home is to ensure the privacy and security of those living behind it. It signals for all who approach that the home is not a public venue. When one approaches a door to a house, one seeks permission to enter because of our common understanding that this is a private residence.

Unrelated co-habitants with individual apartments in a two-family house may share the doorway vestibule area and the steps leading to various parts of the home, storing personal

items and engaging in private conversations in these spaces, further illustrating that these living arrangements are based on the presumption that the space behind the front door is part of the home and within the residents' zone of privacy.  Even the shared use of common areas by other residents and guests, "does not render such areas 'public' with respect to the constitutional prerequisites for permissible entry by the police"  (People v Garriga, 189 AD2d 236, 241 [1st Dept 1993]).  It is one thing to accept that in a shared home you will come across other residents at the front door, in the hallway, perhaps at the steps leading to the basement, attic, or upstairs apartment; it is quite another to give up all rights to privacy from government intrusion into these same shared spaces.  The former is a necessary and inherent consequence of the living arrangement itself, the latter requires voluntary abnegation of all expectations of privacy.  Absent conduct by residents suggesting a shared environment is actually public, a resident of a two-family house is entitled to the same constitutional protections as those in a single-family house in these common areas.  There is no distinction as matter of law between the two residences -- a single-family house and a two-family house -- impacting the constitutional analysis.

There are also societal interests in protecting a resident's privacy in these common areas of the home (Oliver v United States, 466 US 170, 178 [1984] ["In assessing the degree

to which a search infringes upon individual privacy, the Court
has given weight to such factors as the intention of the Framers
of the Fourth Amendment . . . and our societal understanding that
certain areas deserve the most scrupulous protection from
government invasion."]; Johnson v United States, 333 US 10, 14
[1948] ["The right of officers to thrust themselves into a home
is also a grave concern, not only to the individual but to a
society which chooses to dwell in reasonable security and freedom
from surveillance."]).  The conception of "home" may "extend to
facilities shared by several persons not related to each other"
(see Powell, 54 NY2d at 531). People's lives are not so atomized
and impersonal in these shared environments to negate the
constitutional protection of privacy afforded a resident whose
home includes communal space. As our shared living arrangements
necessarily reflect family commitments, evolving social norms,
limited personal finances, and market forces that drive housing
preferences and vacancy rates, these factors redefine concepts of
"intimacy" and communal interaction.  Residents, like defendant,
should not be penalized and stripped of their constitutional
protections based on choices driven, in part, by financial and
family concerns (Garriga, 189 AD2d at 241).

        Here, the People failed to present any evidence that
defendant's expectation of privacy in the shared area of a two-
family house should be treated any differently from that of a
resident living in a single-family house.  Nor did they establish

that defendant's expectation is unreasonable as a constitutional matter because he had forgone any privacy interest in the entrance to the house and the stairs leading to his apartment. The People did not introduce evidence that the vestibule and staircase were generally open and accessible to the public. There was no testimony that the officers observed unannounced people freely entering and exiting the house (cf. People v Hansen, 290 AD2d 47, 52-53 [2002] [testimony established hallway of two-family home was "a public hallway, open to anyone who wants to walk in off the street"]).  The police did not even testify as to how the front door was open, thus failing to establish the means for some public access to this area, or that they had consent to enter the house.  Even if the vestibule was accessible to the public, the people failed to elicit evidence to suggest that defendant did not have an expectation of privacy to the only internal means to reach him: the steps and area immediately outside his apartment door.  It is the People's burden to rebut the presumption that the space was private, and their evidence fell far short of establishing a basis for the police to cross the "firm line at the entrance of the house" that marks the constitutional perimeter of the "home" (Payton, 445 US at 590; Kirk v Louisiana, 536 US 635, 638 [2002]; Hodge, 44 NY2d at 557).

The People argue that defendant had no more privacy interest in the vestibule and stairs leading to his second-floor

living space than a tenant in a large apartment complex or multi-unit apartment building has in the building lobby and stairwell. This comparison ignores the intimacy inherent in living in a house that distinguishes it from a multi-unit building where the first floor is open and accessible to the public. Unlike the small foyer entry of a home which is closed off to the public, a building lobby may be open to the public and serve as an extension of the steps or path leading to the building. As such, the lobby is transformed into public space, where strangers walk through and sometimes ascend the stairs. For some buildings, a visitor must enter the lobby in order to be announced to the tenant. For these reasons we have held that "hallways and stairways of large multiple dwellings, where delivery [and] service [personnel], visitors and other strangers are continually moving, must be considered public places" (People v Peters, 18 NY2d 238, 244 [1966], affd sub nom Sibron v New York, 392 US 40 [1968]; see also People v Powell, 54 NY2d 524 [1981] [lobby of six story men's shelter was public place and not part of home]; cf. People v Allen, 54 AD3d 868, 869 [2d Dept 2008] ["Although the apartment building had only six apartments, the defendant failed to demonstrate that he had any legitimate expectation of privacy in the apartment building's vestibule, as it was accessible to all tenants and their invitees."]). Given the number of people who pass through a lobby, tenants in these multiple-unit dwellings have a diminished expectation of privacy

in these open, publicly-accessible spaces that is not experienced by persons who share closed, common areas in a two-family house.

Other jurisdictions have recognized the need for some evidence of public access akin to that found in a larger, multi-unit building before reducing residents' expectations of privacy. The Sixth Circuit, for example, has held that the "nature of the living arrangement in a duplex, as opposed to a multi-unit building, leads [to the conclusion] that a tenant in a duplex has a reasonable expectation of privacy in common areas shared only by the duplex's tenants and the landlady" (United States v King, 227 F3d 732, 746 [6th Cir 2000], quoting United States v McCaster, 193 F3d 930, 935 [8th Cir 1999] [Heaney, J. concurring in part and dissenting in part]). The Ninth Circuit has similarly held that in a building containing two apartments and the landlord's living quarters, the tenants "exercised considerably more control over access to [the entry way to the two apartments] than would be true in a multi-unit complex, and hence could reasonably be said to have a greater reasonable expectation of privacy than would be true of occupants of large apartment buildings" (United States v Fluker, 543 F2d 709, 716 [9th Cir 1976]). The Supreme Court of Connecticut has held that a defendant has an expectation of privacy in the common basement of a two-family house (State v Reddick, 207 Conn 323, 332 [Conn 1988]). As the Fifth Circuit has noted, "[c]ontemporary concepts of living such as multi-unit dwellings must not dilute [a

defendant's] right to privacy any more than is absolutely required" (Fixel v Wainwright, 492 F2d 480, 484 [5th Cir 1974]).

Like other persons living in two-family houses, absent evidence evincing intent to create an "open house" environment, defendant had a reasonable expectation of privacy in the vestibule and staircase for these constituted part of his home. As such, he was entitled to the constitutional protection against a warrantless home arrest, and the police entry violated Payton.[2]

B.

Contrary to the People's argument the issue is preserved for our review. In order to preserve an issue, a defendant must register a protest at a time when the court has the opportunity of effectively altering its response (see CPL 470.05 [2], People v Graham, 25 NY3d 994, 996 [2015]). Here, defense counsel argued that the Police entered defendant's home in violation of Payton, and the People responded that he had no legitimate right to privacy in the hallway. Defense counsel argued that since the police were "unaware as to how they gained entry into the two-family home," the judge should be careful when considering Payton, as there was no testimony defendant "actually exited the residence before he was arrested." This protest

---

[2] Nor did the People establish that the warrantless arrest was justified under one of the narrow exceptions to the warrant requirement, such as when emergency aid is required, when in hot pursuit of a fleeing suspect, to prevent the imminent destruction of evidence, etc. (see Kentucky v King, 563 US 452, 460 [2011]).

sufficiently preserved the issue.

Even assuming arguendo that defense counsel's statements lacked specificity, an issue is preserved if "the court expressly decided the question raised on appeal" (CPL 470.05 [2]). The court, by necessity if not implication, decided that defendant had no privacy interest in the area between the front doorway and the door leading to defendant's living space when it denied defendant's motion to suppress and concluded the arrest was outside the home because it was conducted "in the hallway of his apartment building." Unsurprisingly, the Appellate Division treated the issue as preserved, holding that "where the defendant lived in the upstairs apartment of a building containing two separate apartments, there is clearly a "distinction between homes and common areas such as halls and lobbies . . . which are not within an individual tenant's zone of privacy" (People v Garvin, 130 AD3d 644, 645 [2d Dept 2015] [internal quotation omitted]).

II.

A.

There is a second ground for concluding the arrest is constitutionally invalid. Like Judge Wilson, I would apply Payton where, as here, the sole reason the police went to defendant's home was to effect his arrest, and in doing so without a warrant, they undermined defendant's indelible right to

counsel.  I agree with Judge Wilson that the majority's reasons
for not applying Payton are unpersuasive (Wilson, J. dissenting
7-11).  I write separately to discuss the interplay between these
constitutional protections.


                              B.

        "[W]e have delineated an independent body of search and
seizure law under the State Constitution" that implicates the
State's indelible right to counsel (People v Harris, 77 NY2d 434,
438 [1991]).  As the Court has emphasized,

>           "The safeguards guaranteed by this State's
>           Right to Counsel Clause are unique (NY Const,
>           art I, § 6).  By constitutional and statutory
>           interpretation, we have established a
>           protective body of law in this area resting
>           on concerns of due process,
>           self-incrimination and the right to counsel
>           provisions of the State Constitution which is
>           substantially greater than that recognized by
>           other State jurisdictions and far more
>           expansive than the Federal counterpart. The
>           Court has described the New York rule as a
>           'cherished principle,' rooted in this State's
>           prerevolutionary constitutional law and
>           developed 'independent of its Federal
>           counterpart.' The highest degree of judicial
>           vigilance is required to safeguard it.
>           Manifestly, protection of the right to
>           counsel has become a matter of singular
>           concern in New York and it is appropriate
>           that we consider the effect of Payton
>           violations upon it" (Harris, 77 NY2d at 439
>           [internal citations omitted]).

        In New York, the indelible right to counsel attaches
when the police commence formal proceedings by filing an
accusatory instrument (People v Samuels, 49 NY2d 218, 221

[1980]).  Under the Criminal Procedure Law, an arrest warrant may not issue until an accusatory instrument has been filed (CPL 120.20).  "Thus, in New York once an arrest warrant is authorized, criminal proceedings have begun, the indelible right to counsel attaches and police may not question a suspect in the absence of an attorney" (Harris, 77 NY2d at 440, citing Samuels, 49 NY2d at 221-222).  It would be the simplest of things for police to avoid the mandates of our Constitution and sidestep a defendant's indelible right to counsel by visiting a defendant solely to effectuate a house arrest without a warrant.  Surely that is not what we intended when this Court recognized the broader protections afforded under our constitution (People v Bing, 76 NY2d 331, 339 [1990] [State right to counsel "far more expansive than the Federal counterpart"]).

Fourth Amendment jurisprudence and our independent analysis under our constitutional search and seizure and indelible right to counsel provisions dictate that defendant's statements were obtained in violation of his constitutional rights.  Any other decision would make it too easy for police to avoid the warrant requirement and its attendant right to counsel.  As my dissenting colleague points out, there are various ways in which the "doorway threshold" rule adopted by the majority undermines defendant's rights and potentially escalates the tension inherent in a visit from the police (J. Wilson dissent at 13-16).  An attempted warrantless home arrest places a defendant

in the dangerous position of risking a forced entry if defendant refuses to open the door, or after initially opening and then attempting to close the door to retreat inside.  These actions may raise suspicion or suggest the existence of exigent circumstance.  Police may very well believe, for example, that evidence is being or about to be destroyed, that defendant is attempting to secure a weapon, placing the officers in imminent danger of bodily harm, or that defendant is attempting to flee (see People v McBride, 14 NY3d 440 [2010]; People v Riffas, 120 AD3d 1438 [2d Dept 2014]).  A rule that prevents these situations benefits defendants, police, and society.

We must be mindful that the police interaction illustrated by this case implicates express constitutional provisions intended to protect the individual from government overreach and abuse of power -- the right to be secure from unreasonable warrantless government intrusions of the home, and the indelible right to counsel -- and, as such, requires robust judicial oversight.  The Court has made it abundantly clear that our "independent body of search and seizure law" be read so as to "best promote[] the protection of the individual rights" of the People of the State of New York, and that our indelible right to counsel is a "cherished principle" entitled to "[t]he highest degree of judicial vigilance . . . to safeguard it" (Harris, 77 NY2d at 438, 439 [internal quotation marks and citations omitted]; see also People v Lopez, 16 NY3d 375, 380 [2011];

People v Jones, 2 NY3d 235, 240 [2004]).

This right to counsel must be kept inviolate. Otherwise, we would encourage warrantless home arrests and normalize behavior that both the State and Federal Constitutions expressly prohibit. The possibility of suppressing unlawfully obtained information is insufficient to offset countervailing forces seeking to secure inculpatory information. We have warned against this danger in the federal context where the right to counsel does not attach with the issuance of an arrest warrant (Harris, 77 NY2d at 440). The practical effect of the federal rules "is that little incentive exists for police to evade Payton in the hopes of securing a statement" and "the incremental deterrent resulting from suppressing statements made afer an illegal arrest in the home [is] minimal" (Harris, 77 NY2d at 440).

Federal law does not dictate or guide the analysis of our broader protections under the State Constitution (People v P.J. Video, Inc., 68 NY2d 296, 304 [1986] ["[T]his [C]ourt has adopted independent standards under the State Constitution when doing so best promotes predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens."]). In any case, federal jurisprudence does not support the conclusion that every warrantless threshold arrest is constitutionally permissible. Significantly, the specific question presented in defendant's

appeal -- whether a warrantless home arrest is permissible when the police summon a person to the door for the sole purpose of making an arrest -- is an open question not resolved by United States Supreme Court precedent. Contrary to the majority's conclusion, King v Kentucky (563 US 452 [2011]) does not provide clear guidance as to how the Supreme Court would rule if the question were squarely presented to that Court (maj op at 15).

In King, the Court considered the limited question of the circumstances under which police impermissibly create an exigency (563 US at 470). Officers ended up outside the defendant's apartment immediately after a fellow officer observed a controlled drug buy involving a resident of a neighboring apartment. Smelling marijuana smoke, they banged on the apartment door, and announced themselves as police (id. at 456). Immediately afterwards they heard people and things moving inside the apartment, leading them to believe that evidence was about to be destroyed, at which point they forcibly entered by kicking in the door (id.). The Supreme Court held that the officers' conduct was entirely consistent with the Fourth Amendment (id. at 471). In contrast to King, here the police had probable cause before they set out to defendant's apartment, and yet went directly to his home with the sole intention of making a warrantless arrest, without any suggestion of exigent circumstances. Their intent in avoiding the warrant requirement was not solely to make an inquiry, gather more evidence, or seek

consent for a search (id. at 466-467), but to arrest defendant, take him to the precinct, and ask him questions outside the presence of a lawyer.[3]

In upholding the warrantless search in King, the Court recognized that the police may approach a suspect, even in the privacy of the person's home to ask questions, because "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private [person] might do" (id. at 469). However, when law enforcement's only reason to approach a person at the home is to make an arrest, the police are attempting something quite different from the uninvited knock of the average person. It is true that a suspect can lawfully ignore a police officer's knock and inquiry (id. at 469-470 ["[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak."]). In reality, it cannot be denied that a police officer's statement carries the force of an official command not easily disregarded. Of course, the presence of the police at one's home for any

---

[3] The majority's claim that the Court has rejected the subjective approach and only considers the reasonableness of police conduct misses the point (maj op at 15-16). The undisputed purpose of the police visit to the defendant's home is an appropriate consideration here, just as it was in King. As Judge Wilson and I explain, viewed objectively, the circumstances did not justify the action, which was unreasonable and thus a violation of defendant's rights (see King, 563 US at 464, citing Brigham City, 547 US at 404; see Wilson, J. dissenting op at 13-14).

reason would cause concern or apprehension for anyone, but an officer seeking to make an arrest intensifies this natural reaction.

Furthermore, as the majority acknowledges (maj op at 9), there are federal Circuit Courts that have interpreted the Fourth Amendment to prohibit certain warrantless home arrests outside the home as Payton violations (see Fisher v City of San Jose, 558 F3d 1069, 1074-75 [9th Cir 2009] [en banc] [defendant seized when police surrounded his home, even though arrest happened outside]; United States v Saari, 272 F3d 804, 807-08 [6th Cir 2001] [defendant under arrest when cops knocked forcefully on door with guns drawn]; United States v Reeves, 524 F3d 1161, 1165 [10th Cir 2008] [officers effectively commanding defendant to open door constituted an arrest]; see also US v Allen, 813 F3d 76, 81 [2nd Cir 2016] [recognizing circuit courts holding officers may violate Payton without entering defendant's home]). These decisions are animated by the purposes of the Fourth Amendment to protect the individual's right to be secure in the home and free from potential abuse and deployment of coercive tactics that render the protections all but illusory.

If the police determine that securing a warrant is too time-consuming or impractical under the circumstances (not argued here), the police may wait for a defendant to exit the home. Of course, such a warrantless arrest is also subject to certain constitutional constraints (see People v De Bour, 40 NY2d 210,

222-223 [1976] [officers cannot ask pointed questions of an individual without a founded suspicion that criminality is afoot, cannot forcibly stop and detain without reasonable suspicion, cannot arrest without probable cause]).  So long as police action comports with the law, the question of where to execute an arrest is left to the discretion of the officials in charge.

### III.

The police violated defendant's constitutional rights against a warrantless home arrest and his indelible right to counsel when they went to his home without a warrant for the sole purpose of arresting him, and effectuated the arrest in the absence of exigent circumstances. I dissent from the majority's suggestion that such conduct is both constitutionally permissible and a required outcome of our case law.

Whether this violation requires the reversal of defendant's conviction is a different question and one not properly before us on this appeal.  In this case, because the courts below did not address the People's alternative grounds in support of defendant's conviction, the matter should be reversed and remitted to permit consideration of those arguments.[4]

---

[4] Given my conclusion that the matter should be remitted, I do not opine on the merits of defendant's challenge to the persistent felony offender statute (Penal Law § 70.10).

People v Sean Garvin

No. 82

WILSON, J.(dissenting):

Absent exigent circumstances, officers planning to arrest a suspect at home must obtain a warrant.  The majority's analysis neither satisfies the Federal and State Constitutions nor serves the interests of New York citizens and law enforcement officers. Indeed, the precedents on which the majority relies "recognize

- 1 -

that it would have been more prudent if the police obtained a warrant for defendant's arrest before going to his home" (People v McBride, 14 NY3d 440, 447 [2010]).  Because the police planned to arrest him, did not obtain a warrant, and no exigent circumstances were present, Mr. Garvin's threshold arrest was unlawful and his case should be remanded to the Appellate Division to consider whether the fruits of that arrest were sufficiently attenuated to admit into evidence or whether any error in admitting them was harmless beyond a reasonable doubt.

I.  Payton v New York and the United States Constitution

In Payton v New York (445 US 573 [1980]), the Supreme Court held that, in the absence of exigent circumstances, the Fourth Amendment prohibits law enforcement officials from making a warrantless and nonconsensual entry into a suspect's home to arrest him.  Although Payton addressed one oft-reserved question – whether and under what circumstances federal law enforcement officers may enter the home of a suspect – it, and its failure to grapple squarely with the legacy of United States v Santana (427 US 38 [1976]), raised numerous others.[1]  In United States v Allen

---

[1] Among them: what constitutes a defendant's home, whether force or ruses of various descriptions can induce a defendant to leave it, how to determine the admissibility of statements made subsequent to a violation, and if its protections apply when a defendant either briefly exits his home and is pursued back into it or is in the home of a third party. "In following the rule

(813 F3d 76 [2016]), the United States Court of Appeals for the
Second Circuit resolved two of the most vexing: where is the
threshold, and whose position relative to it is determinative?
For the reasons stated in its thorough opinion, which I would
adopt in full, the Second Circuit concluded that "where law
enforcement officers summon a suspect to the door of his home and
place him under arrest while he remains within his home, in the
absence of exigent circumstances, Payton is violated regardless
of whether the officers physically cross the threshold" (id. at
88-89).[2]

The majority does not take issue with Allen's conclusion.
Instead, it attempts to distinguish the facts of that case from
those before us (majority op. at 10).  Dennis Allen, Jr. was
arrested "at the front door" or "inside the threshold" of his
home (Allen, 813 F3d at 78; id. at 79).  Sean Garvin was arrested
"at the threshold" or "in the doorway" of his (People v Garvin,
130 AD3d 644, 645 [2d Dept 2015]); he did not step into the
hallway.  Although the Appellate Division found, in language

_____

enunciated in Payton, New York courts have had to resolve
numerous issues that have arisen in the wake of its
interpretation" (Barry Kamins, 1-3 New York Search & Seizure §
3.04 [2017]).
[2] As the majority correctly points out, the Second Circuit did
not go so far as to require a warrant before the police could
arrest a suspect who voluntarily departed the home's confines and
joined the police on the exterior of the threshold prior to her
arrest (Allen, 813 F3d at 78 ["if Allen had come out of the
apartment into the street and been arrested there, no warrant
would be required"]).

borrowed from a prior opinion, that Mr. Garvin "voluntarily emerged", there is nothing in its decision to indicate that he emerged <u>from the apartment and into the hall</u>, as opposed to from the recesses of the apartment to the door.  In neither instance did law enforcement officers enter the apartment.

I understand the majority to be saying that the factfinders concluded Mr. Allen was inside his apartment, beside the open door, where Mr. Garvin had advanced until he was standing between the doorjambs: his toes in the hallway; his heels in his home. Under the majority's rule, the threshold is the narrow area between the doorjambs, and a suspect who pierces the plane of the door with any part of his body, for any length of time, forgoes the protection of his home.  Under its interpretation of the Appellate Division's findings, Mr. Garvin (however unwittingly) did exactly that.

We are bound by the findings of fact made by the Appellate Division.  I am not bound, however, by the majority's interpretation of those findings, and I see nothing in the Appellate Division's choice of prepositions that constitutes a finding that the People met their burden to prove Mr. Garvin (or a portion of him) had crossed the threshold of his apartment. Even were I to assume that was the relevant threshold - a proposition I join Judge Rivera in doubting - the protections of the Federal and State constitutions and the prospect of a life behind bars should not turn on the vagaries of a prepositional

phrase.   Those vagaries are amply illustrated in this case by the People's key witness, who testified that both he and the defendant were simultaneously standing "in the doorway" – an implausible scenario if that witness, like the majority, understood the phrase to mean precisely the space between the doorjambs, and one that suggests he, like most people, understood "in the doorway" to mean "near it", possibly in- or outside, or some of each.

Nor does a consultation of the record, which includes the following colloquy with that witness, whose testimony the court credited, resolve the ambiguity:

Detective: . . . we placed handcuffs on him at the doorway.

Defense: Inside the apartment or outside the apartment?

Detective: Inside the doorway.

Defense: He had stepped out of his apartment?

The People: Judge, I'm going to object.

The Court: Counsel, rephrase it.

Defense: When you say, 'inside the doorway', inside the apartment or outside the apartment?

Detective: Inside the doorway.

Defense: Inside the doorway.

Detective: He was standing at the doorway.

Defense: Okay.  And the handcuffs, detective, were placed on him when he was by the doorway?

Detective: Yes.[3]

Thus, contrary to the majority, I understand the Appellate

Division to have found Mr. Garvin was inside, rather than

partially outside, his apartment and thus subject to the

protections of the U.S. Constitution elaborated in <u>Allen</u>.[4]  At

the very least, there is no record evidence to support a finding

that he was fully outside when arrested.

However, because the majority treats this case as one in

which some fragment of the defendant's body exited his home

before he was arrested, I note that nothing in today's decision

precludes a lower court or a latter decision from adopting <u>Allen</u>

when confronted by a case in which a defendant consented to an

arrest while remaining entirely inside his home.  Similarly,

because no police officer crossed the threshold or otherwise

conducted a search of Mr. Garvin's apartment, nothing in today's

decision prevents a future court from announcing a rule that

_____

[3] The arrest, furthermore, took place when the police first told
Mr. Garvin he was under arrest – several seconds before he was
handcuffed.  In the words of the People's witness, "When I
knocked on the door, he answered the door this time.  I looked at
him. He looked at me. I said, 'You're under arrest.'  He turned
around, put his hands behind his back, and I handcuffed him."
This version of the story further supports the suggestion that it
is fair to understand the Appellate Division's finding Mr. Garvin
was "in the doorway" to mean "just inside the doorway" rather
than "on the sill".  The witness does not describe Mr. Garvin
stepping forward after opening the door, and it would be
surprisingly aggressive for any person to open a door and advance
on a trio of uniformed officers.
[4] In addition to <u>Allen</u>'s persuasive force, we have an interest in
ensuring our protections are no less than those guaranteed by the
local federal courts.

would suppress evidence seized during a consensual search after a warrantless threshold arrest.

## II.  The New York Constitution

The Court's disagreement over the present facts and their implication, as well as the at least three-way circuit split over how to apply Payton in similar circumstances (see Allen, 813 F3d at 81), suggest it is time for us to consider whether the New York Constitution provides greater clarity to police officers, private citizens, and future litigants than the present federal rule, which implicates defendants in a high-stakes game of inches that they do not know they are playing.  I believe that it should.

I would therefore go further than Allen and prohibit purposeful warrantless arrests of suspects who are induced to leave their homes by the actions (be they direct or furtive, and however noncoercive) of the police. In other words, if the police plan to arrest someone who is at home, absent exigent circumstances, until they have an arrest warrant, they may not go to the person's door to arrest him or cause him to leave his home to arrest him outside of it.

As an initial matter, "we have not hesitated in the past to interpret Article I, § 12 of the State Constitution independently of its federal counterpart when necessary to assure that our

state's citizens are adequately protected from unreasonable government intrusions" (People v Scott, 79 NY2d 474 [1992, Kaye, CJ, concurring]).  In case after case, "this court has demonstrated its willingness to adopt more protective standards under the State Constitution when doing so best promotes 'predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens'" (People v Torres, 74 NY2d 224, 228 [1989] [quoting People v P.J. Video, 68 NY2d 296, 508 (1986) and People v Johnson, 66 NY2d 398, 407 (1985)]).

One of the most significant of those cases, despite our initial failure to anticipate the Supreme Court's holding in Payton (see People v Payton, 45 NY2d 300 [1978]), is People v Harris.  That case held, as I would here, that "the Supreme Court's rule does not adequately protect the search and seizure rights of citizens of New York" and that our constitution provided greater protections than its federal counterpart to defendants subject to warrantless home arrests (77 NY2d 434, 437 [1991]).  It also instructed that "[s]tate courts, when asked to do so, are bound to apply their own Constitutions notwithstanding the holdings of the United States Supreme Court" (id. [emphasis added]), as "the failure to perform an independent analysis under the state constitution would improperly relegate many of its provisions to redundancy" (Scott, 79 NY2d at 496 [Kaye, CJ,

concurring]).  Mr. Garvin asks us to apply ours here.[5]

     The application of the New York Constitution to the present case is affected by the principle of stare decisis.  The majority points to four prior cases in which this Court has held that certain warrantless threshold arrests do not violate Payton: People v Minley (68 NY2d 952 [1986]), People v Reynoso (2 NY3d 820 [2004]), People v McBride (14 NY3d 440 [2010]), and People v Spencer (29 NY3d 302 [2017]).

     None of those four cases, however, addresses the question Mr. Garvin raises.  They deal, as the majority itself concedes (majority op. at 11), only with the application of Payton and the Fourth Amendment.  Because they do not consider whether any matters peculiar to this state warrant greater protection under Article I, § 12, I approach that inquiry as an issue of first

_____

[5] The majority declines to address this argument on the ground that Mr. Garvin failed to raise the lawfulness of his arrest under the New York Constitution at the suppression hearing (majority op. at n 8).  At the suppression hearing, Mr. Garvin's counsel expressly advised the Court that he was relying on the Omnibus motion papers previously filed with the Court. Those papers expressly state: "The Defendant moves for a hearing to determine whether Defendant was improperly seized and unlawfully detained in violation of the Defendant's constitutional rights derived from both the United States Constitution, Fourth and Fourteenth Amendments, New York State Constitution, Article [1], Section 12 . . ." (emphasis added).  Furthermore, Mr. Garvin maintained at the hearing that the violation of "both his federal and his state constitutional rights" was specifically intended to circumvent his right to counsel.  These arguments sufficed to preserve the issue for the review he now requests.  As the majority believes the issue was not preserved, the question of whether our constitution affords more protection in this regard than its federal counterpart remains open.

impression.  Even were our decisions in Minley, Reynoso, McBride, and Spencer to bear on today's issue, both "lessons of experience and the force of better reasoning" (People v Bing, 76 NY2d 331, 338 [1990]) would compel me to abandon that line of decisions.

As to the force of better reasoning, it is indisputable that none of the cases cited by the majority elaborate on how to apply Payton to threshold arrests.  Minley and Reynoso are mere memoranda, devoid of any reasoning.  Minley treats an issue the Appellate Division had concluded was "not properly preserved for appeal"; indeed, the Appellate Division "assume[d] . . . that the warrantless arrest was illegal under Payton" (People v Minley, 112 AD2d 712 [4th Dept 1985]).  Reynoso disposes in two sentences of disputed facts, without remanding for the Appellate Division's determination the possibility that a detective reached across the threshold to pull defendant out of his home (People v Reynoso, 309 AD2d 769 [2d Dept 2003]) – a scenario that seems unlikely to comport with even a narrow reading of Payton or our application thereof in People v Levan (62 N.Y.2d 139 [1984]; but see People v Ashcroft, 33 AD3d 429 [1st Dept 2006] ["The police did not violate defendant's Fourth Amendment rights when they reached and pulled him out as he stood in close proximity to his doorway since, by his actions, defendant knowingly and voluntarily presented himself for public view"]).  McBride is about whether the police created the exigent circumstances they used to justify their entry, not threshold arrests, and occasioned both a two-

judge dissent and a cautionary aside from the majority that anticipated the rule I suggest today (14 NY3d at 449 [Pigott, J, dissenting] ["[T]he real issue is 'could the police, as required by the Fourth Amendment and legions of cases, have obtained a warrant prior to going to defendant's apartment when they clearly intended to effect an arrest?'"]).  Spencer, as well as Mr. Spencer's brief, treated the Payton issue in that case as a footnote to the central contest over juror disqualification. Measured against the depth of analysis provided by the federal courts, and against fresh reasoning occasioned by the lessons of experience, the precedents on which the majority relies suggest a nearly weightless brand of stare decisis.

As to those lessons of experience, they demonstrate that, contrary to the majority and the Appellate Division's contention, the current rule is not clearly and easily understood.  Perhaps because, as Supreme Court recently bemoaned, "no New York case since Payton appears to have addressed the issue" of what constitutes a "threshold" (People v Mendoza, 49 Misc3d 1007, 1012 [Sup Ct, NY County 2015]), the current rule has failed to protect New York citizens from illegal searches (Kozlowski, 69 NY2d 761; Riffas, 120 AD3d 1438; Mendoza, 49 Misc3d 1007 [finding that police had violated the defendant's Fourth Amendment rights]; see also Correa, 55 AD3d 1380; Reynoso, 309 AD2d 769; Anderson, 146 AD2d 638 [declining to suppress evidence gathered by police who breached the threshold]).  For the same reason, it has failed to

safeguard the court system from constant appellate litigation (see, e.g., People v Kozlowski, 69 NY2d 761 [1987]; People v Spencer, 135 AD3d 608 [1st Dept 2016]; Garvin, 130 AD3d 644; People v Riffas, 120 AD3d 1438 [2d Dept 2014]; People v Pearson, 82 AD3d 475 [1st Dept 2011]; People v Correa, 55 AD3d 1380 [4th Dept 2008]; People v Rodriguez, 21 AD3d 1400 [4th Dept 2005]; Reynoso, 309 AD2d 769; People v Andino, 256 AD2d 153 [1st Dept 1998]; Mauceri v County of Suffolk, 234 AD2d 350 [2d Dept 1996]; People v Schiavo, 212 AD2d 816 [2d Dept 1995]; People v Francis, 209 AD2d 539 [2d Dept 1994]; People v Min Chul Shin, 200 AD2d 770 [2d Dept 1994]; People v Rosario, 179 AD2d 442 [1st Dept 1992]; People v Lewis, 172 AD2d 775 [2d Dept 1991]; People v Marzan, 161 AD2d 416 [1st Dept 1990]; People v Anderson, 146 AD2d 638 [2d Dept 1989]; People v Brown, 144 AD2d 975 [1st Dept 1988]; People v Nonni, 141 AD2d 862 [2d Dept 1988]).

As this Court's first sustained consideration of the validity of threshold arrests, today's opinion may resolve some of that ambiguity by defining the threshold to mean only the narrow space between the doorjambs. But in doing so, it provides not only a uniform line to lower courts but also a better guide to those witnesses willing to tailor their testimony to the law. The rule the majority upholds invites both parties – but especially those parties better versed in the law – to engage in unverifiable he-said, he-said contests on the stand. Even for honest witnesses - and I assume the witnesses here were

completely truthful - the rule presents defendants who may not wish to testify with an unpleasant dilemma and tests the precise spatial recall of participants in what is typically a tension-fraught situation where all parties are focused on their safety, not architectural niceties.  Moreover, a clear rule can founder on everyday imprecisions of language, as illustrated by the difference the majority and I have about what the Appellate Division found here.  A rule requiring police, in the absence of exigent circumstances, to obtain a warrant before (a) going to a home for the purpose of arresting a suspect or (b) causing that suspect to enter or cross the threshold, offers a far brighter line (see United States v Holland, 755 F2d 253, 259 [2d Cir 1985, Newman, J., dissenting] ["I appreciate the majority's preference for a 'clearly-defined boundary line' that will be readily apparent to an officer in the field.  However, that line already exists for cases such as this: the line between arrests with a warrant and those without a warrant"]).  Although the majority criticizes that alternative for looking to the subjective intent of the police (majority op. at 13), it will prove easier to verify whether the police visited a house to make an arrest or merely to further an investigation than whether a suspect's nose crossed the threshold (see United States v Titemore, 335 FSupp2d 502 [D Vt 2004]).  The cases the majority cites discourage investigations into whether individual officers acted in bad faith or with an invidious purpose (Kentucky v King, 563 US 452

[2011]; <u>Whren v United States</u>, 517 US 806, 814 [2001]; far from requiring that kind of subjective analysis, a rule declaring purposeful at-home arrests absent exigent circumstances unreasonable searches and seizures under the New York Constitution takes an objective view of the circumstances. The Second Circuit had no difficulty establishing police officers in <u>Allen</u> planned to arrest the defendant (813 F3d at 78 ["four Springfield police officers went to Allen's apartment with the pre-formed plan to arrest him" (quotations omitted)]).

The present rule is not only subject to confusion and manipulation, but also has practical repercussions that subvert both the ideals of the New York bill of rights and the goals of our law enforcement officers.

Adherence to the majority's rule "involves collision with a prior doctrine more embracing in its scope" (<u>People v Peque</u>, 22 NY3d at 194).  As Judge Rivera explains in her dissent, "the safeguards guaranteed by the State's Right to Counsel Clause are unique . . . and far more expansive than the federal counterpart" (77 NY2d at 439).  Their protection requires the "highest degree of judicial diligence" (<u>id.</u>).  New York police "have every reason to violate <u>Payton</u> . . . because doing so enables them to circumvent the accused's indelible right to counsel", which would attach were an arrest warrant obtained (<u>id.</u> at 440).  Indeed, the evidence indicated that the police were motivated by just such considerations in this case.  Even though they had developed

probable cause for Mr. Garvin's arrest by 2:45 pm on the day of the arrest, they did not attempt to secure a warrant or stake out his house.  Instead, to question him in the absence of an attorney and while his girlfriend's presence in police custody - secured through deceitful statements by a detective - might motivate a confession, they elected to effect a warrantless threshold arrest.  Here as in Harris, "this interplay between the right to counsel rules established by New York law and the State's search and seizure provisions . . . provides a compelling reason for deviating" from the federal rule (id.).

When the police call on a suspect's home with the intention of making an arrest, one of several scenarios can unfold.  In most instances, that suspect will acquiesce to the police's simple request to leave the home – an exchange that results in peaceful arrests but operates in derogation of the right to counsel and, in some instances, as an unwitting waiver of the suspect's right to avoid unreasonable searches of that home (see, e.g., Allen, 813 F3d at 79 ["Allen, who had appeared at the door in his stocking feet, asked whether he could retrieve his shoes and inform his 12-year-old daughter, who was upstairs in the apartment, that he would be leaving with the officers.  The officers advised Allen that he could not return upstairs unless they accompanied him, which they did"]; Nonni, 141 AD2d at 862 ["Detective McCormack then announced from his position outside the doorway that the defendant was under arrest.  The defendant

responded by stating, 'Let's take it off the street'.  The defendant thereupon turned and walked into the house with the police following him"]; Rosario, 179 AD2d at 442 ["The police officers identified themselves and arrested defendant at the doorway of his apartment.  Defendant, who wore nothing above the waist, was told to get a shirt.  The police officers followed defendant into his apartment as he went to retrieve his shirt"]).

In other instances, law enforcement officers will resort to a variety of ruses to achieve the same result.  The lower courts have upheld arrests subsequent to noncoercive subterfuges that, although validated by this Court's memoranda upholding Reynoso and People v Roe (73 NY2d 1004 [1989]), hardly instill a community's trust in the police (see, e.g., People v Robinson, 8 AD3d 131 [1st Dept 2004] [police fabricated a noise complaint]; People v Hollings [Sup Ct Bronx County 2004] [police asked the defendant to help solve a fictitious crime]; Reynoso, 309 AD2d 769 [police had defendant's mother wake him at midnight because a fictitious friend was suffering an undisclosed emergency]; People v Williams, 222 AD2d 721 [2d Dept 1995] [police said that there had been an accident involving defendant's vehicle]; People v Gutkaiss, 206 AD2d 628 [3d Dept 1994] [police had defendant's relative call about construction work]; People v Coppin, 202 AD2d 279 [1st Dept 1994] [police officer said she might go out with defendant]).  They have also derailed what should have been clean convictions because the police used impermissibly coercive means

(see, e.g., People v Fernandez, 158 Misc 2d 165 [Sup Ct, NY County 1993] [police impersonated a parole officer conducting a residence check]; see also People v Roe, 136 AD2d 140 [3d Dept 1988] ["if police had falsely informed defendant that there was a gas leak requiring his evacuation, his departure from his home would be no more voluntary than it would be had the police surrounded the premises and ordered him out with guns drawn"]).

In a final category of instances, the suspect will respond to the police's arrival either by refusing to answer or by opening and then attempting to close the door – the other horn of the "unfair dilemma" confronting suspects subject to warrantless home arrests (United States v Reed, 572 F2d 412, 423 n9 [2d Cir 1978]). Whereas officers equipped with an arrest warrant would have more authority in the eyes of their suspect and the clear right to enter the house if the situation required, the majority's rule creates unfortunate uncertainties for all parties to the encounter. On some occasions, that uncertainty tempts the officers into compromising their case by effecting an unlawful arrest (see, e.g., Riffas, 120 AD3d at 1438-1439 [when defendant, who had never crossed the threshold of his apartment, attempted to shut the door, the police violated his Payton rights by pushing the door open, pulling the defendant into the public hallway, and arresting him]). On others, the mounting frustration of officers trapped outside the threshold presents a danger to the suspect, bystanders, and the arresting officers

(see, e.g., McBride, 14 NY3d at 444 [police, frustrated by defendant's refusal to open the door, climbed his fire escape and knocked, guns drawn, on the window, sending the defendant's guest crying to the door]). This scenario also presents a danger to the People's case, as the police, who cannot enter the home without a warrant and "cannot by their own conduct create an appearance of exigency" (Levan, 62 NY2d at 146), have provided notice to a suspect who now has an opportunity to flee, destroy physical evidence inside the home, or even arm himself in anticipation of resisting arrest.

None of these scenarios is desirable. They, and a variety of other questions occasioned by the current rule (see fn 1), can be avoided by creating a warrant requirement for the purposeful at-home arrests of suspects.[6] That requirement would protect the rights of citizens from abuse, our law enforcement officers from the threat of escalating circumstances, and the People from having a carefully planned case upended by credible testimony that a defendant had been securely inside his threshold or an officer had been, even inadvertently, out of bounds. It would

---

[6] The rule would not prevent the police from staking out a home and conducting a public arrest based on probable cause after a suspect exits that home without the state's prompting, although officers not wishing to wait could instead obtain an arrest warrant. It also would not prevent the police from effecting the unplanned arrest of a person whose home they approached for the purposes of making an inquiry (cf. King, 563 US 452; Allen, 813 F3d at 84-85 [discussing Titemore, 427 F3d 251).

not, because of the exigent circumstances exception and the relative ease of securing an arrest warrant when probable cause exists, unduly hamper the important work of our police forces.

Although the People suggest they can meet their burden of demonstrating exigent circumstances justified the warrantless arrest in this case, there is no evidence to suggest the police faced an "urgent need" to apprehend their suspect (McBride, 14 NY3d at 446 [quoting United States v Martinez-Gonzales, 686 F2d 93, 100 (2d Cir 1982)]).  Any speculative danger that Mr. Garvin might commit another robbery, use a weapon, or attempt to flee could have been prevented by the simple expedient of stationing an officer outside his home while an arrest warrant was obtained. Any risk that he would realize the game was up and destroy the evidence was occasioned by the police and their scheme to bring Mr. Garvin's girlfriend and her daughter to the station as a form of leverage over the defendant.  There is no record support for the conclusion that the police were faced with an exigency other than that which they created.  To conclude otherwise would be to allow the exception to swallow the proposed rule.  Applying that rule to the present circumstances, Mr. Garvin's arrest violated the state constitution.

As a result, I would reverse the order of the Appellate Division and remit the case to that court to determine whether the People have established that Mr. Garvin's statement, and the money recovered at the precinct, were attenuated from the

violation or that the hearing court's refusal to suppress them was harmless beyond a reasonable doubt.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed.  Opinion by Judge Stein.  Chief Judge DiFiore and Judges Garcia and Feinman concur.  Judge Fahey dissents in part in an opinion.  Judge Rivera dissents in an opinion in which Judge Wilson concurs, Judge Wilson in a separate dissenting opinion.

Decided October 24, 2017